# In re A.S. & K.S., Juveniles

[764 A.2d 1188]

No. 00-157

Present: **Amestoy, C.J., Dooley, Morse, Johnson and Skoglund, JJ.**

Opinion Filed October 20, 2000

Motion for Reargument Denied November 17, 2000

*Michael Rose*, St. Albans, for Appellant.

*William H. Sorrell*, Attorney General, Montpelier, and *Barbara L. Crippen*, Assistant Attorney General, Waterbury, for Appellee SRS.

*Robert Appel*, Defender General, and *William A. Nelson*, Appellate Attorney, Montpelier, for Appellees-Juveniles.

**Morse, J.** Father D.S. appeals from the order of the Caledonia Family Court terminating his parental rights with respect to his two daughters, A.S. and K.S.* On appeal he argues that the court failed to

---

* The mother's rights were also terminated, and she has not appealed from the court's decision.

properly consider the alternative of a "planned permanent living arrangement" to termination or to make findings regarding the viability of this alternative. He also argues that this Court should remand the case to the family court for reconsideration of its disposition in light of the recently enacted Permanent Legal Guardianship Act. We affirm.

A.S. and K.S., currently ages 11 and 13 respectively, were taken into state custody on May 1, 1998, and thereafter determined to be children in need of care and supervision (CHINS). They were in their mother's custody at the time pursuant to mother and father's divorce decree. Mother, subsequently given a probable diagnosis of bipolar illness and post-traumatic stress disorder with the possibility of other elements of a psychotic disorder, appeared to be suffering from delusions at the time, most likely related to her diagnosis of bipolar illness. She spoke with a counselor from the girls' school and indicated that she was hearing voices and that she thought she was being watched. The counselor also noted that the family appeared to be in chaos: there was graffiti on the walls of their apartment, and all the children appeared to be sleeping in the living room with their mother despite the existence of upstairs bedrooms.

A.S. and K.S. were also exhibiting extreme behavior at school, including banging desks, screaming during class, running through the halls and threatening other students. The police were called on several occasions, and K.S. had expressed suicidal thoughts to the school counselor. K.S. also disclosed previous incidents of sexual abuse involving a babysitter and an older sister's boyfriend. After being taken into custody, the children received placement in a therapeutic foster home. They continued to manifest extreme behavior, including throwing furniture and attempting to physically hurt themselves, but eventually their behavior moderated. K.S. has needed respite care throughout her foster placement.

Initially, and following early case reviews, the goal for A.S. and K.S. was reunification with their mother. Because father supported this goal, he did not seek the appointment of an attorney during his early participation in the process, nor did he contest the case plans for the girls. The representative from Intensive Family Based Services Program, the group providing support services towards reunification, also indicated that father was not considered as a placement for the children because he had previously been incarcerated and because IFBSP was under the impression from both SRS and other family members that he had little to no contact with the children and provided no financial support to the family.

Father was incarcerated in 1989 for aggravated sexual assault involving an adult female. K.S. was four years old at the time, and A.S. was six months old. He was released in December 1993, and has been on parole since that time. His parole is set to end July 1, 2004. Testimony at the termination hearing revealed, however, that the girls' mother brought them to visit their father in prison regularly and that he both called them and wrote letters to them while he was in prison. Following his release, father continued to visit with the children on a regular basis. Furthermore, following his release, father sought to initiate payment of child support, and he has paid it regularly to the children's mother since 1993 with the exception of a short period of time when he was unable to meet the financial obligation.

With respect to his progress since his release in 1993, the girls' father has been completely compliant with his extensive parole conditions. He has consistently participated in support services related to his status as a sex offender, including services related to substance abuse. He has remained employed with one exception and has held his most recent position working for a wood products company for four years. Nevertheless, father's parole officer expressed concern about the father's ability to handle the stress of children who had significant parenting needs beyond those of average children. The social worker who leads father's sex offender support group also stressed that father would need a significant support system if he were to be a placement for the girls and that the girls would need ongoing counseling as well.

A.S. and K.S. have been identified as having significant and specialized parenting needs. Both girls receive special education services based on their emotional and behavioral issues. Both girls have been diagnosed with oppositional defiant disorder, and A.S. has been diagnosed with anxiety disorder, not otherwise specified. A.S.'s and K.S.'s therapists both testified that the girls have an urgent and immediate need for permanency. A.S.'s therapist indicated that A.S. needs more than average parenting, and K.S.'s therapist testified that K.S.'s return to either of her biological parents would be very rough on her. The caseworker from Northeast Kingdom Mental Health who works with therapeutic foster homes stated that both children need more that normal parenting, that a particular expertise is required to maintain their current emotional and developmental state and that the girls' improvement in those areas is attributable to their current foster parents' expertise regarding the girls' specialized parenting

needs, as well as the stability their home affords the girls. A.S.'s therapist also testified that she would not support long-term foster care simply to continue visitation with her parents given the instability of the arrangement.

Dr. Philip Massad, a psychologist, performed assessments of both mother and father. Although his assessment of the girls' father revealed nothing significant regarding whether father would pose a danger to the two children, he concluded, based on the results of the testing performed, that father's parenting skills were merely fair. He noted that father did not possess the specialized or sophisticated skills that A.S. and K.S. demanded and opined that father would be taxed and potentially overwhelmed by the parenting demands of the children, especially with respect to K.S.'s needs.

At the close of the four-day hearing, the family court discussed with the parties the various options available for the girls. Ultimately, the court concluded that, given the available alternatives, termination of parental rights was in the best interests of the children. The court noted that the children have a serious and urgent need for permanency and that the foster parents expressed a willingness to facilitate appropriate continuing contact with the girls' biological parents. The court expressed frustration at being forced to choose between two less-than-ideal dispositions, but concluded that termination of the parents' residual parental rights was the best alternative available when compared to the instability of continuing foster care. Father now appeals that decision to this Court.

■ Father argues that the family court did not properly consider the alternative of a "planned permanent living arrangement" referenced in 33 V.S.A. § 5531(d)(4), the statute governing permanency hearings, or make findings regarding this alternative to termination. The statutory language of § 5531, however, plainly reflects that such a living arrangement is the *least desirable* alternative to the various dispositions available for children in the state's custody. The statute provides that, following a permanency hearing, the trial court should adopt a permanency plan that includes whether and, if applicable, when:

    (1) the child will be returned to the parents;
    (2) the child will be released for adoption;
    (3) the child will be referred for legal guardianship; or
    (4) the child will remain in the same or be placed in another planned permanent living arrangement because the

commissioner has demonstrated to the satisfaction of the court a *compelling reason* that it is not in the child's best interests to return home, *to have residual parental rights terminated and be released for adoption* or placed with a fit and willing relative or legal guardian.

33 V.S.A. § 5531(d) (emphasis added).

■ Further, when considering a petition to terminate residual parental rights, the trial court must make findings regarding whether there has been a substantial change in material circumstances and whether termination is in the best interests of the child. See *In re C.r.M.*, 163 Vt. 542, 545, 659 A.2d 1159, 1161 (1995). The court did so in this case, and we must affirm unless the findings are clearly erroneous. See *In re J.M.*, 160 Vt. 146, 149, 624 A.2d 362, 363-64 (1993). Father argues that termination of parental rights provides no more permanency than long-term foster care or a guardianship. The court, however, found otherwise. It found that it was in the best interest of the children to terminate parental rights, although this could result in severing the children from the birth parents who they love, because this was preferable to the lack of permanency that would result from denying the termination. On the record before us, the court's finding is not clearly erroneous.

■ Father argues in the alternative that this case should be remanded in light of the recently enacted legislation allowing for permanent guardianship, which he contends applies to pending cases because the legislation is remedial in nature. We need not determine whether the recently passed legislation should apply to pending cases, however, because the legislation by its own terms limits its application to cases in which adoption of the child or return to the child's parents is not reasonably likely. See 1999, No. 162 (Adj. Sess.), § 2 (codified at 14 V.S.A. § 2664(a)(2)) (requiring court to determine by clear and convincing evidence that neither returning child to parents nor adoption is reasonably likely before issuing an order for permanent guardianship). In this case, the foster family has expressed a willingness and a desire to adopt both girls. The trial court also has found that return of the girls to their father can not occur within a reasonable time, thereby making adoption a likely possibility for the girls.

The wisdom of limiting the option of ordering a permanent guardianship to cases only in which adoption is not an available

alternative is a question to be resolved by the Legislature. In its statement of policy accompanying the act, the Legislature stated:

> The creation of a permanent guardianship for minors will provide the opportunity for a child, *whose circumstances make adoption or return to the care of the parents not reasonably possible,* to be placed in a stable and nurturing home for the duration of the child's minority. The creation of permanent guardianship offers the additional benefit of permitting continued contact between a child and the child's parents. A permanent guardianship would be a *last resort only when the options of return to the parents and adoption have been fully explored and ruled out based on clear and convincing evidence.*

1999, No. 162 (Adj. Sess.), § 1 (emphasis added). The court in this case expressed frustration at its inability to order a permanent placement for the girls that would not be subject to modification, but would allow for continuing contact with the parents. We note that the Legislature will have the opportunity to revisit the question of its limitation on the availability of permanent guardianship in the near future, for the act contained a sunset provision terminating the act on June 30, 2003. See 1999, No. 162 (Adj. Sess.), § 3. However, as it stands, the statute plainly would not apply to the facts of this case.

*Affirmed.*