2004 VT 125

## In re A.G., Juvenile

[868 A.2d 692]

Nos. 03-532 and 04-081

Present: Dooley, Johnson, Skoglund and Reiber, JJ., and Gibson, J. (Ret.), Specially Assigned

Opinion Filed December 23, 2004

Motion for Reargument Denied January 27, 2005

·*Allison N. Fulcher* of *Martin & Associates*, Barre, for Appellant Father.

*Michael Rose*, St. Albans, for Appellant Mother.

*William H. Sorrell*, Attorney General, Montpelier, and *Kirstin Schoonover*, Assistant Attorney General, Waterbury, for Appellee SRS.

¶ 1. **Dooley, J.** Mother and father appeal from orders of the Windham Family Court relating to their daughter A.G., who was adjudicated a child in need of care and supervision (CHINS) in 1999. Specifically, mother challenges the family court's decision to place A.G. in long-term foster care. Father appeals the court's decision to terminate his residual parental rights. We affirm the family court's decisions pertaining to both father and mother.

¶ 2. State intervention through the Department of Social and Rehabilitation Services (SRS) became necessary in 1999. In July of that year, SRS filed a CHINS petition to protect seven-year-old A.G. from the effects of her mother's binge drinking, which sometimes left the child without proper supervision. Mother stipulated to a CHINS adjudication. There were no allegations that mother physically abused A.G., however, and SRS did not seek to remove A.G. from mother's care. Mother's I.Q. is within the borderline range of intellectual function, and she suffers from epilepsy. In the past, she has chosen intimate male partners, including A.G.'s biological father, who abused her. Because of mother's binge drinking, her poor choice of intimate

male partners, and her consequent mental health problems, the initial SRS case plan required mother to avoid relationships with abusive men, to obtain counseling for alcohol dependence, and to engage in therapy for her mental health problems. The case plan also set forth counseling services for A.G.

¶ 3. In February 2000, the court issued a disposition order approving the case plan and recommending services for mother and A.G. Mother was arrested two weeks later, however, for disorderly conduct, and she ultimately spent ten days at the Vermont State Hospital for evaluation. SRS placed A.G. in foster care, where she has remained since.

¶ 4. A.G. has experienced the turmoil of two termination-of-parental-rights (TPR) proceedings. The first proceeding came in 2001 after SRS changed the case plan goal to termination of mother's parental rights. At the time, mother's relationship with the SRS caseworker and A.G.'s foster mother had deteriorated to a low point. Recognizing the poor relationship and its potential to harm A.G., the court issued a protective order, pending the contested TPR hearing, forbidding the foster mother or the caseworker from supervising visitation between mother and daughter.

¶ 5. In its August 2001 order denying the first request for termination, the court harshly criticized the agency for not complying with that protective order. It found that the caseworker had impeded visitation between A.G. and mother and placed "obstacles in the way of a continuing positive parent-child relationship between mother and child." Noting that the caseworker's actions came at a time when mother was "operating under serious mental and emotional disabilities," the court found that certain agency actions were "not even consistent with the case plan of improving [mother's] mental health." The court moved sua sponte to hold SRS in contempt for violating the protective order. Prior to the scheduled contempt hearing, the agency remedied the problem by increasing visitation between A.G. and mother, and the court ruled that the contempt motion was moot.

¶ 6. As to mother, the court's August 2001 order found that she "had made considerable progress in addressing the issues identified in the spring of 2000 as needing attention and the reasons that [A.G.] remained in SRS custody: alcohol abuse, mental health problems, and abusive relationships." Mother sought and received treatment at the Brattleboro Retreat, and there was no sign that she had resumed drinking. The court also found that "[d]espite all of the problems [mother] has had, there is no evidence that she ever caused her child anything greater than indirect risk of harm." Ultimately, the court

concluded that mother should be afforded more time to improve her situation, and the plan for reunification should go forward.

¶ 7. In November 2001, father began seeking joint custody of A.G. and joint visits with mother. Father was never considered a custodial resource for A.G. for a variety of reasons, including his repeated criminal behavior and unstable lifestyle. Mother initially acquiesced to joint visitation, but wanted to end the arrangement a month later because the visits were becoming unduly stressful. The stress escalated to violence during the 2001 Christmas holiday. Wanting more time with A.G., father went unannounced to mother's home during her visit with A.G. and banged repeatedly on mother's door, shouting his demands for more visitation. Father's conduct was frightening, and mother refused to open the door. Father eventually left, but A.G. was so shaken up that mother called the foster family to take A.G. to their home.

¶ 8. The situation further deteriorated in mid-February 2002 when father physically assaulted mother. Frightened for her safety, mother informed the foster parents and A.G. that she was leaving her apartment to go to a women's crisis center. Unfortunately, father learned of mother's location from some paperwork filed at the court, and, consequently, mother relocated to another crisis center two hours driving distance from A.G. Then, after father made threatening remarks to A.G.'s foster family, SRS moved A.G. to an undisclosed location with a new foster family. A.G. remained in hiding from February 26 to July 29, 2002. Only one visit between mother and A.G. appears to have occurred during that five-month period. Mother feared that father would find her new home so she did not want to tell SRS where she was living, and for reasons that are unclear, SRS would not divulge A.G.'s whereabouts to mother. Thus, throughout the summer of 2002, disputes between mother and the agency arose over whether visitation would take place and on what terms.

¶ 9. Meanwhile, mother's life was stabilizing in her new location. Mother found part-time employment, and in May 2002, she secured an apartment. The caseworker wrote to mother that A.G. would be placed in her care thirty days after SRS approved the apartment she found in her new community. A Barre SRS employee inspected mother's residence and approved it, but A.G. remained in the otherwise anonymous foster home until the end of July. The agency wanted Dr. Laurence Bart to conduct an expert evaluation of mother before reunification. Mother eventually completed the evaluation with Dr. Bart although she would not allow him access to her medical history.

Like the SRS caseworker from Barre, Dr. Bart inspected mother's living arrangements and found them suitable for A.G.

¶ 10. After A.G. returned to her regular foster home at the end of July 2002, the distance between mother and A.G. made transportation arrangements difficult. Mother did not have a car, and traveling to see A.G. by bus involved a twelve-hour round trip to the child's community. As a result, visitation again became a point of contention between mother and SRS officials. Their already difficult relationship was further aggravated by mother's firm belief that the agency had no right to demand that she reveal details of her current circumstances — the name and address of her employer, her work schedule, or mental health records. In September 2002, the apparent standstill in the case led SRS to modify A.G.'s case plan goal to termination once again. SRS filed petition in furtherance of the plan in October.

¶ 11. In November 2002, Dr. Bart filed his report and opined that mother was ready to resume parenting A.G. He recommended that SRS return A.G. to mother's care. After receiving Dr. Bart's report, the agency did not withdraw its petition to terminate mother's rights.

¶ 12. The court's October 2003 order denying TPR found that, as to mother, no change of circumstances had occurred because her parenting ability had not deteriorated or stagnated. The court seemed sympathetic that mother "took steps to extricate herself from [father's] violent presence, only to have her whereabouts revealed, either inadvertently by SRS or the relief from abuse court process." But the court was also concerned that mother's reluctance to share information with SRS was interfering with efforts to reunite her with A.G. SRS believed that "until there is verification, SRS can have little confidence in [mother's] ability to parent [her] ten year old child." The court also noted the close, loving and supportive relationship that existed between mother and A.G. despite long periods of separation, and, therefore, denied termination. On the other hand, the court found ample evidence to terminate father's residual parental rights in A.G., and it did so in the order.

¶ 13. In November 2003, the court held a status conference to discuss the next steps in the case. The court did not want to sever A.G.'s bonds with mother, but it also did not want to disrupt the child from her present circumstances. The court informed the parties of its preferences so that SRS could consider them when developing a new case plan, and it suggested that mother think about moving back to the town in which A.G. was living to resume reunification efforts. Visitation was also discussed, and the court was informed that A.G. had spent a

few overnight weekend visits with mother in mother's new home. Mother's attorney secured transportation funding for those visits on a temporary basis from the Vermont Defender General. The court and the parties also discussed making plans to facilitate a Christmas visit with mother in her home.

¶ 14. SRS arranged to have A.G. spend her Christmas school vacation with mother at her home, but, at A.G.'s request, also arranged to have her return to her foster family for Christmas Eve and Day, returning to mother thereafter until January 2. Mother was unhappy that A.G. would return to the foster parents, but knew that it came at A.G.'s insistence. During the visit, mother began yelling at A.G. about returning to her foster family for Christmas. A.G. tried to explain her decision, and mother told her she had been hypnotized. A.G. asked mother to stop and began crying. Mother called A.G. a crybaby. A.G. said she was scared and called her foster father to come and get her. Mother unplugged the phone and put it out of reach. A.G. attempted to leave the apartment and reach the neighbor who was also her emergency contact, but mother prevented her from leaving. A.G. pounded on the wall in a further attempt to contact the neighbors. When the police arrived, A.G. said she was relieved. Afterwards, A.G.'s psychotherapist described A.G.'s state of mind:

> Despite love for her mother, she expresses great fear that she will be removed from the [foster] home and that her mother will be given custody. Whenever she has phone contact or visitation with her mother, or a court session that extends the possibility of reunification, she becomes extremely destabilized. This was particularly apparent after the recent court appearance as well as after the holiday visitation with her mother. Following the court appearance, A.G. experienced extreme symptoms of hypervigilance, anxiety, agitation, depressed mood, clinging to her foster parents and regressive play. According to her teacher, she cried frequently during school, needed numerous breaks to sit alone and had great difficulty concentrating. Similarly, after the tremendously difficult visit with her mother, A.G. was so distraught that I was asked to meet with her during my Christmas vacation, in order to help her calm down and stabilize again.

> After being ridiculed, harassed and physically trapped by her mother, A.G. expressed to me a mixture of hurt, anger, fear and despondency about her mother's behavior. Again,

she clearly stated that she wanted to be adopted by the [foster family] where she felt safe, accepted and far more peaceful.

¶ 15. SRS prepared and filed a new case plan, that recommended long-term foster care. At the permanency hearing held about thirty days later, the lawyer for A.G., representing A.G.'s position, indicated that she would not support the SRS recommendation of long-term foster care. She agreed that she supported the concept of long-term foster care with a permanent caregiver, but had concerns about visitation and possible reunification with the mother, particularly after the Christmas "debacle." She further asserted that she would be filing a TPR petition on behalf of A.G. so that A.G. could pursue adoption. The court adopted portions of the new SRS case plan at the permanency hearing, found that changed circumstances existed and approved the plan for long-term foster care.

¶ 16. Mother's appeal seeks an order returning A.G. to her care. Mother argues that, considering the court's findings that she was sober, employed, and had suitable housing, it was error to defer to SRS's judgment that further verification of her situation was necessary. Moreover, mother argues that the court's intent to provide A.G. with permanency cannot be achieved with long-term foster care. Father claims the court erred by terminating his rights, considering that he had always acted properly toward A.G.

¶ 17. CHINS proceedings are protective in nature and focus on the welfare of the child, the child's safety and permanency being the paramount concern. 33 V.S.A. § 5501(a)(1) & (4); *In re R.B.*, 152 Vt. 415, 420, 566 A.2d 1310, 1312-13 (1989). Recognizing the child's interest in being raised by his or her parents, the Legislature directed the separation of children from their families "only when necessary for [the child's] welfare or in the interests of public safety." 33 V.S.A. § 5501(a)(3); *In re J.H.*, 156 Vt. 66, 71, 587 A.2d 1009, 1012 (1991). The statutory mechanism established to fulfill those objectives requires periodic review of the child's circumstances, and allows for modification of the court-approved goal for the child upon motion of a party. See 33 V.S.A. § 5528 (setting forth alternative dispositions for a child adjudicated CHINS); *id.* § 5531(a) (requiring permanency hearing every twelve months a child remains in custody). The court is permitted to consider modification of the court-approved goal only upon a showing of a substantial and material change of circumstances. *Id.* § 5532; *In re J.H.*, 156 Vt. at 71, 587 A.2d at 1012-13. The party seeking modification bears the burden of demonstrating the requisite change

of circumstances, and must show how the proposed change serves the child's best interests under the criteria of § 5540. *In re L.S.*, 172 Vt. 549, 549-50, 772 A.2d 1077, 1078-79 (2001) (mem.). The decision on modification will be upheld if the findings are not clearly erroneous and the conclusions are supported by the findings. *In re A.F.*, 160 Vt. 175, 178, 624 A.2d 867, 869 (1993).

I.

¶ 18. Mother claims the family court erred in approving long-term foster care. She asserts that the court erroneously found changed circumstances and that the court's disposition does not provide A.G. with the stability and permanency required. We find that the court's decision is adequately supported by the findings.

¶ 19. The decision of whether a substantial change of circumstances has occurred "is a matter within the sound discretion of the family court." *In re D.C.*, 168 Vt. 1, 5, 712 A.2d 902, 905 (1998). A substantial change of circumstances is most often found when a parent's ability to care for a child has either deteriorated or stagnated. *In re S.M.*, 163 Vt. 136, 139-40, 655 A.2d 726, 728 (1994). Stagnation is shown by no improvement or the lack of sufficient improvement over time. *Id.* at 139, 655 A.2d at 729. Thus, the "central question is whether 'the improvement substantially conformed with the expectations at the time of the CHINS adjudication and with SRS's case plan.'" *Id.* at 140, 655 A.2d at 729 (quoting *In re D.B.*, 161 Vt. 217, 220, 635 A.2d 1207, 1210 (1993)).[1]

¶ 20. In its October 2003 order, the court found no change of circumstances as to mother and declined to terminate mother's parental rights. The court relied upon Dr. Bart's report in deciding to reject this second TPR petition. The court found that A.G. and mother had a "close bond" and "related closely to each other." The court further noted that her progress had not stagnated, but was nonetheless concerned about her "extreme reluctance to divulge information

---

[1] The dissent argues that the relevant precedent is *In re D.M.*, 2004 VT 41, 176 Vt. 639, 852 A.2d 588 (mem.), and that it stands for the proposition that the case plan is not a "mere checklist" that a parent must satisfy to regain custody. *D.M.* was, however, a case in exactly the opposite posture from this one, where the mother was arguing that termination was inappropriate because she "followed the case plan and cooperated with service providers." 2004 VT 41, ¶ 7. It did not change the law that failure to follow the case plan could constitute changed circumstances for purposes of disposition order modification.

regarding her medical situation, alcohol addiction and employment." On balance, the court concluded that mother's lack of progress was partially due to father's violent behavior and there was not a showing of a substantial change in circumstances to warrant termination.

¶ 21. In January 2004, the situation had changed, and the court found that mother's behavior during the 2003 Christmas holiday and her continued refusal to provide information to SRS amounted to a substantial change of circumstances. Mother's actions went well beyond the failure to meet expectations that we routinely find is sufficient to demonstrate changed circumstances to support a modification of a juvenile disposition order. First, the court noted that mother's conduct during the December 2003 visit contributed to changed circumstances. Exactly when it was most critical for mother to build a loving relationship with A.G. leading to restoration of custody, she "ridiculed, harassed and physically trapped" A.G. to the point where A.G. was afraid for her personal safety. Most importantly, supported by the psychotherapist, A.G. informed SRS and the court *for the first time* that she did not want to visit her mother again and through her lawyer would seek termination of parental rights. Thus, the central finding of the termination decision — that A.G. and mother had a "close bond" and "related closely to each other" — was no longer true by the time of the permanency hearing.[2]

¶ 22. The second major factor for the court in finding changed circumstances was mother's refusal to provide information to SRS. The case plan report outlined that SRS could not independently confirm that mother had participated in any part of her case plan in the previous year; it had no information on mother's therapy, sobriety, parent counseling or work. The case plan information is entirely consistent with the October 2003 TPR decision. In that decision, the court notes the same lack of information, adding that "SRS rightly takes the view that until there is verification [of mother's progress with sobriety or other treatment providers], SRS can have little confidence

---

[2] In arguing that there were no changed circumstances *as a matter of law*, the dissent largely ignores A.G.'s change of attitude and position. Thus, the dissent argues "that A.G. and mother have demonstrated a close, loving, and appropriate relationship" and later on that "another termination proceeding would further aggravate A.G.'s present uncertainty about her future." *Post*, ¶¶ 41, 46. The record is clear that A.G. is uncertain about her future because she fears that she will be forced to reunite with her mother, and she intended to bring another termination petition to eliminate that uncertainty. In short, the "close, loving, and appropriate relationship" had disappeared as a result of mother's misconduct.

in her ability to parent this ten year old child." The court relied upon a November 2002 report by Dr. Bart, but noted that mother "was obstructive because she would not reveal medical or other sources upon which Dr. Bart would generally rely." Thus, the one-year-old Bart report was based only on his personal observation.

¶ 23. Mother's conduct in December placed in doubt that she had controlled her mental health issues. By the time of the permanency hearing, the last information on mother's circumstances was over a year old, and it was limited because mother prevented access to her treatment providers, if any, despite a direct order to provide access. Thus, the SRS case plan accurately stated that SRS had no first-hand information that mother had participated in any portion of her case plan in the last year, no information that she participated in therapy and made progress, no information that she remained clean and sober, no information that she engaged in parent education services, and no information that she worked and was self-sufficient. Mother's failure to provide this information was in violation of the court's order. If failure to meet expectations in the case plan can constitute changed circumstances for modification of a disposition order, as we have consistently held, then intentional refusal to provide the information to determine compliance with the case plan has the same consequence. The need to protect the well-being of the child demands the same response in both instances. The court's finding of changed circumstances is not clearly erroneous.[3]

¶ 24. Mother argues that the court misunderstood long-term foster care and erroneously relied on it as a solution that would provide A.G. with permanency. We conclude that the court's decision on long-term foster care fully complies with § 5531(d)(4). Before ordering long-term foster care, the statute requires the court to find "a compelling

---

[3] The dissent characterizes the court's earlier acceptance of a reunification goal, despite mother's refusal to provide the ordered information, as a form of res judicata that prevents it from relying on the refusal to provide information as a factor showing changed circumstances. In essence, the dissent's position is that mother's refusal to allow access to information that demonstrates compliance with the case plan had matured into a right to permanently refuse access to information. Thus, under the dissent's theory, the juvenile court had reached the point where it was required to make important decisions bearing on the best interest of A.G. without the critical information necessary to make responsible decisions. We disagree, especially in the context presented here, where mother's behavior during the Christmas home visitation raised significant doubt about her mental stability.

reason that it is not in the child's best interests to return home, to have residual parental rights terminated and be released for adoption or placed with a fit and willing relative or legal guardian." 33 V.S.A. § 5531(d)(4). The juvenile court rejected termination to protect a once strong bond between mother and A.G. The court then determined that, without mother's cooperation concerning her treatment and employment, and considering A.G.'s desire to have no contact with mother after the December visit, it would not return A.G. to mother's home. The court concluded that the only option that would provide A.G. with a stable living situation and not permanently sever her bonds with mother was the long-term foster care recommended in the SRS report. This conclusion is supported by the trial court's findings, and we will not disturb it.

¶ 25. The dissent argues that the family court made a further error in not considering other permanency options, specifically legal guardianship, before ordering long-term foster care. Mother did not raise this claim in the family court or in this Court and, therefore, she waived this argument. See *Fournier v. Fournier*, 169 Vt. 600, 604, 738 A.2d 98, 103 (1999) (mem.) (holding that mother's failure to raise issue in family court waived argument that the court visitation order was invalid because court did not explicitly consider each factor enumerated in 15 V.S.A. § 665). In any event, we find no error.

¶ 26. The case plan filed by SRS, and adopted by the trial court, addressed other permanency options, including placement with other relatives. SRS investigated both mother's sister and father's sister as possible relatives with whom A.G. might be placed and concluded that neither option was feasible. Both sisters live out of state, and a move would require A.G. to be far from both mother and her current foster family. The dissent argues that the court should also have considered the possibility of legal guardianship with A.G.'s present foster family. We do not believe that the family court has an obligation to investigate every available legal guardian. Specifically, the court was not required to discuss guardianship by the foster parents, especially where the record is void of evidence that any party or the foster parents themselves raised guardianship of A.G. as a possibility. SRS fulfilled its required administrative evaluation under 33 V.S.A. § 5531(d), and it was within the court's discretion to accept SRS's findings and conclude that permanent long-term foster care was in A.G.'s best interest.

¶ 27. Mother suggests that the court improperly deferred to SRS, and at the same time, ordered that A.G. remain in Brattleboro, an order beyond its power because SRS, as custodian, could move the

child if it wished. The court was reviewing the permanency plan developed by SRS under 33 V.S.A. § 5531(d), and, as such, the plan's starting point represented the agency's views. The court explained its decision in detail, including specific reasons why it rejected further visitation and reunification efforts. The court declined to order that A.G. be moved out of Brattleboro to a custodial arrangement closer to mother, *as she urged.* On the other hand, the court did not order SRS to keep A.G. in Brattleboro, and there is *no indication that the court was unaware that,* as custodian, SRS could move the child to another foster family. We see no abuse of the court's discretion.

## II.

¶ 28. Father's appeal presents far less complex factual and legal issues. The court's findings describe father as a man who persistently resorts to combative and violent behavior toward women and authority figures when he does not get his way. The court's order explains that father's violent and threatening conduct was so egregious that the SRS caseworker, assigned after the August 2001 order, was forced to cease her involvement in the proceeding because she had developed acute stress disorder. The court found that father did not play a constructive role in A.G.'s life and that his "ability to act in the role of a parent on any level has seriously deteriorated." The court concluded that severing the ties between A.G. and father was in the child's best interests.

¶ 29. Father argues that his aggressive and sometimes violent behavior towards individuals involved in this proceeding was never directed at A.G. and that he has generally acted appropriately with her during visits. The court's findings detail years of instability, criminal behavior, alcohol abuse, and violence on father's part. Father terrorized mother and A.G.'s foster family, causing the child's five-month separation from the people at the center of her life. The court found that A.G. became depressed during the five-month separation. The record bears out the court's finding that father's conduct was detrimental to A.G., and that it was unlikely he could serve as a parental resource in the future. Father has not demonstrated error or an abuse of the court's discretion in severing A.G.'s ties with father. The court's decision as to father is, therefore, affirmed.

*The court's October 2003 order terminating father's residual parental rights and denying termination of mother's residual parental*

*rights is affirmed. The order of January 30, 2004 approving long-term foster care is also affirmed.*

¶ 30. **Skoglund, J.,** dissenting in part. I agree with the Court that the record supports the family court's decision to terminate father's rights in A.G. because he did not play a constructive role in A.G.'s life. The family court committed two clear errors in its order relating to mother that require me to dissent from this Court's affirmance of the long-term foster care decision. The family court first erred in concluding that a substantial and material change of circumstances had occurred three months after it found no such change and denied the State's petition to terminate mother's rights — for a second time. The second error was ordering A.G. to remain in foster care on a long-term basis without considering the permanency options 33 V.S.A. § 5531(d) provides, such as legal guardianship, and in the absence of a compelling reason to leave her in the foster care system. Accordingly, I respectfully dissent.

¶ 31. This case began to prevent the risk of harm posed to A.G. by mother's binge drinking. The State has never alleged that mother physically harmed A.G., subjected her to verbal abuse, or neglected her over a long period of time. In August 2001, the family court found that mother never caused A.G. "anything greater than indirect risk of harm." Consequently, A.G. was a relatively well-adjusted child when she was removed from mother's home. The record shows that throughout the family court proceedings A.G. has continued to share a close bond with her mother, notwithstanding SRS's flawed approach to reunite this family.

¶ 32. From the beginning of this case, SRS and mother struggled over the issue of releases so that SRS could verify mother's progress in counseling. The court found that, on her own, mother obtained assistance for her problems because she felt that she could make better progress in a confidential setting. She stopped drinking in February 2000, received counseling for alcohol abuse, and participated in Alcoholics Anonymous. The court found that mother had "done a reasonable job so far of working a program for recovery that she put together herself." It further observed that mother's decisions prior to the first termination hearings "had successful outcomes in that they enabled her to get a grasp of herself, her problems, her goals, and make preliminary progress on all fronts: sobriety, mental health, and independence from an abusive partner."

¶ 33. Mother's improvement by late 2001 was enough to allow A.G. to spend overnight visits with mother, up to fourteen overnights per

month. At that time, the SRS caseworker projected that A.G. would return to mother's care in April 2002 because the only outstanding issue that needed to be addressed was appropriate housing for mother and A.G. SRS communicated that plan to the family court in a November 2001 permanency hearing. The caseworker told the court that although she wanted a forensic evaluation to support mother and A.G. after reunification, she did not need the report before A.G. returned to live with mother.[4] For reasons that the record does not make clear, SRS changed its position on the evaluation and filed a motion to compel mother to submit to it. In December 2001, the court, by a different judge, granted the motion and ordered mother to participate in the evaluation as a condition for reunification. Although mother stonewalled the evaluator, eventually she participated in the process, but refused to make her mental health records available.

¶ 34. Reunification did not take place in April 2002 because it was derailed by a variety of factors beginning with father's assault on mother in February 2002. Justifiably fearing a repeat of father's assaultive behavior,[5] mother fled the area for the safety of a woman's shelter, and SRS eventually moved A.G. to an undisclosed location. Mother had visitation rights pursuant to a family court order, but SRS permitted only a single visit during the roughly five months A.G. was secreted in her undisclosed location with a different foster family. When mother tried to enforce her right to see A.G., the family court

---

[4] The court pressed the caseworker on this point during the hearing:

> THE COURT: So that's the final issue is the housing at this point?
>
> CASEWORKER: It's really that. And I feel that without access to the information that I usually have for families, it would be very helpful to get Dr. Bart's information who has been wonderful in other cases helping me to support the family.
>
> THE COURT: But you're not looking at Dr. Bart's evaluation as necessarily having to be completed before [A.G.] could be returned to [mother] right? You're ready to do that now if she had housing, regardless of what's in the evaluation?
>
> CASEWORKER: Yes, sir.

[5] As the majority explains, father has a long history of violent and controlling behavior directed primarily at women. His threatening behavior in this case was egregious and included a death threat against A.G.'s caseworker. The caseworker developed acute stress disorder and was unable to work as of June 2003. Although she provided some testimony in the second termination proceeding, her mental health status rendered her unable to testify or be present during the remainder of the proceedings.

refused to hear the motion. Rather, the court ordered mother to pursue an internal SRS appeals process that took until March 2003 to complete. Between February 2002 and March 2003, therefore, the family court deferred its judgment on visitation to that of SRS, notwithstanding the existing order on visitation and SRS's prior violation of the court's visitation protective order.

¶ 35. In October 2002, SRS filed its second motion to terminate mother's rights in A.G. As the majority opinion explains, SRS sought termination due to the "apparent standstill in the case." The State did not base its petition on evidence that mother's condition or progress toward reunification had deteriorated. Lacking such evidence, the State asked the family court to order mother to release information on treatment she had received at Brattleboro Retreat, because, as the attorney for the State acknowledged to the court, he was looking for adverse information to prove his case for termination.[6] Mother opposed the motion, and the court denied it. The court noted that the State did not allege that an emergency existed, that A.G. was in

---

[6] The exchange between the court and the state's attorney reveals how the State viewed its responsibilities in the case. Counsel explained that in its August 2001 order denying the first TPR petition the court had concluded "that SRS didn't have sufficient evidence of mental health problems for the mother." A complete reading of the order does not bear out that characterization of the court's findings and conclusions in 2001. In the August 2001 order, the court found that mother

> has not had a recent mental health status examination, but no evidence was presented that indicated current mental health problems as an interference with her ability to pursue her normal life activities. . . . While she probably does need continued support of some kinds, the type that is advisable at this point has not been identified. The State neither sought a mental health status evaluation . . . nor presented qualified expert testimony that she has present untreated mental health problems that interfere with her ability to resume parenting within a reasonable period of time.

> . . . .

> In short, she has somehow managed to address constructively, on her own, the issues that the SRS Case Plan and the DOC Probation Order were trying to help her address: alcohol abuse, mental health, and relationships with abusive men.

Those findings do not suggest that the court was looking for additional evidence upon which it could find that mother's mental health presented a problem to reunification or that it would have terminated mother's rights if the State had presented an expert witness on mother's mental health status. Rather, the above-quoted language implies that the court was not persuaded by SRS's theory that mother's mental health problems were so bad that severing A.G.'s ties with mother was in the child's best interests.

imminent harm, or that mother had engaged in any assaultive or threatening behavior. The court concluded that the intrusion into mother's privacy and the chilling effect a release would have on her engagement in treatment outweighed the State's need for the information.

¶ 36. The family court also denied SRS's second motion to terminate mother's rights. The court found that mother was living in housing that was suitable for A.G., that she was gainfully employed, that her mental health issues and alcohol issues appeared to be under control, and that there was no evidence of alcohol in her home. Those findings all have ample support in the evidence. The court did not find a substantial or material change in circumstances that would permit modifying A.G.'s case plan goal from reunification to termination of mother's residual parental rights.

¶ 37. At the status conference following that order, the overriding theme was the court's desire to keep A.G. in her present community. The court was aware that mother had moved to a new location to be safer from father and that she had employment and appropriate housing in that location. But the court made clear that it wanted mother to move back to A.G.'s community. It explained that "the fastest way to having a reuniting of this mother and daughter is for . . . the mother and daughter to live in the same community and that community is here." The court further explained that even if the child's current foster parents decided to move to mother's location, it would still be "wary of making that kind of change." SRS took the court's position and incorporated it into its permanency plan. The new plan identified long-term foster care, rather than reunification with mother, as the permanent goal for A.G. The plan required mother to move back to the community in which A.G. was living and gave no consideration to moving the case to the SRS office in mother's new community.[7]

---

[7] SRS's apparent refusal to consider transferring the case to mother's new community appears inconsistent with federal regulations governing the state's receipt of foster care funding. The regulations require SRS to explain how its plan will provide a safe and permanent home for the child "in close proximity to the home of the parent(s)" when reunification is the case plan goal. 45 C.F.R. § 1356.21(g)(3) (2003). Mother made it known that she was settled into her new location as early as the spring of 2002 when SRS approved her home as suitable for A.G. The record contains no meaningful explanation for SRS's decision to keep A.G. in the community she was living in. There may have been good reason not to transfer the case, but SRS's case plans do not provide one as federal law requires to maintain foster care funding for A.G.

¶ 38. At the hearing on the new permanency plan, the court reminded the parties that it wanted A.G. to remain in her current placement and in the same community in which she had been living. The court explained:

> One of the conditions I had, I did not see that it would be in the child's best interests to move her from [the town she lives in]. I thought that there had to be stability. And moving the child to [the town that mother lives in] to strange surroundings, new school, after what she has been through with two termination of parental rights hearings and all of the indecision on the part of the child's life that goes along with that, I thought it would be unwise to move her to [mother's community].

> Now, what I had hoped is that we could develop a reunification plan that would include living here in [A.G.'s hometown]. Apparently, that has not materialized. There has been no effort to achieve that.

> . . . .

> . . . I said before in November that I was not going to remove the child from [her current town]. I have not changed my mind. . . . And as far as I'm concerned, unless and until the Supreme Court tells me differently, that's going to be the law of this case and that's going to be a permanent decision. I am not now or in the future going to remove this child from [the place she lives now]. And when I say the future, I mean at least until the child is of high school age.

In other words, the court determined it was better for A.G. to stay in foster care than to continue reunification efforts if mother would not move closer to A.G. Although the court adopted portions of SRS's permanency plan for A.G., it rejected the plan's provisions for parent-child contact so long as mother was not living in the same town as her daughter.

¶ 39. In its order following the permanency hearing, the family court found that circumstances had changed since October 2003 because mother would not move back to the community in which she had been living and working since 2002, because mother would not sign releases so that SRS could gather information about her, and because of the Christmas 2003 debacle that left A.G. frightened and distraught. This Court's opinion upholds the change-of-circumstances determination by

describing mother's actions as going "well beyond the failure to meet expectations we routinely find is sufficient to demonstrate changed circumstances." I disagree with that conclusion because it is not supported by the law or by the record.

¶ 40. Before the family court may consider a request to modify the disposition of a child found in need of care or supervision, it must find a change of circumstances. *In re A.W.*, 167 Vt. 601, 603, 708 A.2d 910, 913 (1998) (mem.). The change must be both material and substantial. *In re Certain Neglected Children*, 134 Vt. 74, 76, 349 A.2d 228, 229 (1975). As the Court's opinion indicates, stagnation in the parent's work towards reunification is often the substantial and material change of circumstances warranting a modified disposition. See, e.g., *In re A.W.*, 167 Vt. at 603, 708 A.2d at 913 (upholding juvenile court's finding that a material and substantial change of circumstances occurred as a result of mother's stagnation). In those cases, the parent's stagnation was material and substantial because it related directly to the causes for state intervention.

¶ 41. The Court's opinion in this case departs from the precedents on stagnation and treats the court-approved case plan like a checklist that mother must satisfy to withstand a finding of changed circumstances. In *In re D.M.*, this Court rejected the notion that a case plan is a mere checklist that a parent must satisfy to regain custody of her child. 2004 VT 41, ¶ 7, 176 Vt. 639, 852 A.2d 588 (mem.). In that case, the mother argued that circumstances beyond her control prevented her from completing all of the case plan requirements. The Court reasoned:

> The key question for the court when considering whether stagnation has occurred is whether the parent has made progress in ameliorating the conditions that led to state intervention. The SRS case plan is not intended to be a mere checklist the parent must satisfy to ensure the automatic return of the children to the parent's care, however. As this case demonstrates, even if a parent participates in every program set forth in SRS's plan, the main concern must always be whether the individual parent has demonstrated the improvement contemplated at the time the children were removed from the parent's care. In this case, the court applauded mother's efforts and cooperation with SRS and others enlisted to help her regain custody of T.P. and D.M. It found that despite those efforts mother did not demonstrate the improvement expected of her and, thus, it found that circumstances have stagnated.

*Id.* In this case, SRS indicated as far back as 2002 that mother could resume parenting A.G. as soon as she obtained appropriate housing, which she did. There was no evidence presented to the court that mother's drinking problem had reemerged or that she was engaging in relationships with abusive men. Although the Court's opinion characterizes mother's behavior during the Christmas 2003 holiday as raising doubts about her mental health status, that visit was the only bad visit between mother and A.G. in all of the years the child has been in custody. The record shows virtual unanimity among the proceeding's participants that A.G. and mother have demonstrated a close, loving, and appropriate relationship throughout this ordeal. It is telling that, notwithstanding the damage caused by the agency's violation of the family court's protective order on visitation, A.G. and mother's positive relationship endured until mother mistreated A.G. over the 2003 holiday. Under these facts, the December 2003 visit, the only bad visit in four years, does not demonstrate the type of stagnation that this Court described in *In re D.M.*.

¶ 42. Nor does mother's lack of cooperation in signing releases so that SRS can verify her circumstances amount to a substantial and material change of circumstances in light of the court's findings. First, the court made findings on the very matters that SRS insisted it still wanted to verify. The court found that mother was sober, gainfully employed, and appeared mentally stable and healthy. SRS had already approved mother's housing, which again was the only outstanding issue that needed resolution before reunification could occur in 2002. Those findings are all well supported by the evidence. Although the court also found, based on the forensic evaluation, that mother would benefit from further counseling, SRS apparently considered mother rehabilitated and stable enough to allow A.G. to spend overnight visits with mother in her home. The court's findings indicate that mother had resolved the major issues that caused state intervention in the first place. That does not amount to stagnation.

¶ 43. Second, mother had been refusing to release confidential information to SRS since the beginning of this case. I recognize that mother was ordered to do so, but that was true at the time of the first termination hearing as well and did not appear to trouble the family court. In its August 2001 order, which the court adopted and incorporated into its October 2003 decision, the court rejected SRS's position that mother's refusal to release information about her treatment meant that she was uncooperative and unlikely to satisfy the goals of the case plan. Recognizing that SRS's position amounted to form over

substance, the family court found that mother's decisions allowed her to constructively address the issues that SRS wanted her to resolve, and that mother had done a reasonable job in making progress towards resolving them. Had SRS presented any evidence that mother had resumed drinking, had returned to partnering with an abuser, had been unable to care for herself independently, or had shown signs of persistent deteriorating mental health, I would agree that a material and substantial change of circumstances had occurred. SRS presented no such evidence because it had none, and the court's findings reflect that fact. It is significant that the family court refused to make mother release information about her treatment at Brattleboro Retreat when the State moved for an order compelling her to do so. Thus, while mother was directed to sign releases so that SRS could verify her circumstances, the record is inconsistent, at best, about how important it was for mother to sign those releases to regain custody of A.G.

¶ 44. The family court's order placing A.G. in long-term foster care is similarly unsupportable. Mother argues that leaving A.G. in foster care for the foreseeable future fails to fulfill the permanency need the court found was essential to meet the child's best interests. I agree. A.G. has twice suffered the uncertainty inherent in termination proceedings, and the court found that she must know soon where she will be living and with whom on a long-term basis. The court wanted A.G. to remain in her present location and with the foster family that has cared for her during most of her time in custody.[8] It is well established that so long as SRS is the child's legal guardian, SRS is the sole decisionmaker on where and with whom the child will live. See 33 V.S.A. § 5502(a)(10) (providing that legal custodian has the right to physical possession of the minor child and the right to decide with whom and where the minor will live). The family court has no authority to direct SRS to place a child in state custody into any particular home or community. In re J.D., 165 Vt. 440, 444, 685 A.2d 1095, 1099 (1996); In re G.F., 142 Vt. 273, 279, 455 A.2d 805, 808 (1982). Nor may the court modify disposition solely on grounds that the legal custodian might move the child to a different location for whatever reason, including to meet the goal of reunification. See In re J.S., 153 Vt. 365, 372, 571 A.2d 658, 662 (1989) (holding that a change in child's placement alone is not sufficient to warrant a change in disposition). That is essentially what has

---

[8] A.G. was cared for by a different family in a different town during the five months that SRS kept her hidden from both mother and father.

happened here. Fearing reunification in mother's new locale, the court modified the case plan goal to long-term foster care, at least until mother moved geographically closer to A.G.

¶ 45. The fact that the legal custodian may change the foster placement renders long-term foster care in SRS custody the least preferred disposition alternative, particularly when permanency is the paramount concern. *In re A.S.*, 171 Vt. 369, 372, 764 A.2d 1188, 1191 (2000). The court's January 2004 order does not prevent SRS from moving A.G. to a different community or to another foster home. *In re G.F.*, 142 Vt. at 281, 455 A.2d at 809. The fact that SRS removed A.G. from her community and hid her from mother and others during the spring and summer of 2002 demonstrates the power the agency has to change A.G.'s placement at will. As much as the court would like the child to remain in her present school and community to avoid additional disruption in her life, ordering A.G. into long-term foster care with legal custody in SRS does not ensure that goal. The family court's order, therefore, fails its essential purpose by leaving A.G. in the legal custody of an institution that has complete discretion over the child's living arrangements.

¶ 46. Moreover, the family court's order cannot prevent another termination of parental rights proceeding from being filed by the child's attorney or SRS. The court's findings, which the record supports, leave no doubt that another termination proceeding would further aggravate A.G.'s present uncertainty about her future. The majority acknowledges that A.G.'s attorney was contemplating such a filing because, as the attorney argued to the family court, long-term foster care would not accomplish the permanency that A.G. needs so desperately.

¶ 47. The court's disposition order also fails to comply with 33 V.S.A. § 5531(d) and is suspect under federal requirements governing the state's receipt of federal funds to support foster care. As the least desirable permanency option, long-term foster care may be ordered pursuant to § 5531(d) only if the family court first finds "a compelling reason that it is not in the child's best interests to return home, to have residual parental rights terminated and be released for adoption or placed with a fit and willing relative or legal guardian." 33 V.S.A. § 5531(d)(4). The Legislature adopted this language to comply with the federal Adoption and Safe Families Act (ASFA). Pub. L. No. 105-89, 111 Stat. 2115 (1997) (codified at 42 U.S.C. §§ 671-679); H. 703 Statement of Purpose, 1997-1998 Gen. Assem., Bien. Sess. (Vt. 1998). ASFA's primary purpose is to assure the safety of abused and ne-

glected children and to eliminate "the problem of foster care drift." *In re Stuart S.*, 127 Cal. Rptr. 2d 856, 858 (Ct. App. 2002); accord *Ex parte W.T.M.*, 851 So. 2d 55, 59 (Ala. Civ. App. 2002); see generally, D. Herring, *The Adoption and Safe Families Act — Hope and Its Subversion*, 34 Fam. L.Q. 329 (2000) (explaining the goals of ASFA to improve the chances of a child's permanent placement rather than to remain in foster-care drift). When considering the permanency plan for an abused and neglected child that receives federal foster care support, ASFA requires the state's child protection agency to document the compelling reason that long-term foster care is preferable to the other more permanent options of: adoption (following the termination of parental rights); returning the child to her parents; placing the child with a fit and willing relative; or giving legal guardianship over the child to an individual willing to assume that role. 42 U.S.C. § 675(5)(C); *Ct. Appointed Special Advocate v. Dep't of Servs. for Children, Youth & Families*, 834 A.2d 63, 66 (Del. 2003); see also 45 C.F.R. § 1356.21(h)(3) ("If the State concludes, after considering reunification, adoption, legal guardianship, or permanent placement with a fit and willing relative, that the most appropriate permanency plan for the child is placement in another planned permanent living arrangement, the State must document to the court the compelling reason for the alternate plan.").

¶ 48. The Court's opinion concludes that long-term foster care was the only option available to the family court under the circumstances of this case, and, therefore, the court complied with the terms of § 5531(d). Nothing in the record or in SRS's case plan demonstrates, however, that either the agency or the family court considered all of the permanency options, including legal guardianship, before deciding that long-term foster care was best for A.G. Moreover, neither the case plan nor the court's findings or conclusions reflect a compelling reason to abandon the plan for reunification. The order contains a reason, but not a compelling one as contemplated by both state and federal law.

¶ 49. The family court's main concern was keeping A.G. in her present community in the care of the foster family with whom she has lived since 2000. The court announced that position in the November 2003 status conference before SRS had even prepared a new case plan. The case plan SRS developed after that status conference fails to address in any meaningful way why the other statutory disposition options were less favorable to achieve permanency for A.G. The record is silent on what kind of harm, if any, might result if A.G. were integrated into mother's community to facilitate reunification. The

record is also silent on why legal guardianship with A.G.'s present foster family or with another qualified individual was not possible. Notwithstanding federal law mandating that a child's case plan include a compelling reason for rejecting legal guardianship, the plan SRS presented to the court in January 2004 contains no such discussion. In sum, the record does not support this Court's conclusion that the family court complied with § 5531(d) by considering and rejecting legal guardianship and other options as the appropriate permanency plan for A.G.

¶ 50. I would, therefore, reverse the family court's decision regarding mother and send the case back for a new disposition hearing. I am authorized to state that Justice Johnson joins in this dissent.