VERMONT SUPREME COURT
109 State Street
Montpelier VT 05609-0801
802-828-4774
www.vermontjudiciary.org



Case No.      22-AP-170

*Note: In the case title, an asterisk (\*) indicates an appellant and a double asterisk (\*\*) indicates a cross-appellant.  Decisions of a three-justice panel are not to be considered as precedent before any tribunal.*

## ENTRY ORDER

OCTOBER TERM,   2022

In re L.D., Juvenile            }
(A.B., Mother\*)              }

}
}
}

APPEALED FROM:

Superior Court, Chittenden Unit,
Family Division
CASE NO. 196-5-19 Cnjv
Trial Judge: John L. Pacht

In the above-entitled cause, the Clerk will enter:

Mother appeals the trial court's order terminating her parental rights as to her daughter, L.D.  She argues that the court erred in concluding that her progress had stagnated and she could not resume parenting within a reasonable period of time because those determinations were based entirely on father's conduct.  She also claims that the court deprived her of due process because she had insufficient notice of the expectations she needed to meet to regain custody.  We affirm.

The parties are not married, but are the biological mother and father of L.D., born in May 2019.  The Department for Children and Families (DCF) sought and obtained an emergency care order at birth, and L.D. was placed in the conditional care of mother.  The emergency order was based on father's substantial history of violent behavior.  The order barred father from entering the home that mother was sharing with her mother, and permitted father to have only supervised contact with L.D.

Later in May 2019, parents stipulated and the court ordered that L.D. was a child in need of care or supervision (CHINS).  In doing so, both parents agreed that father had numerous criminal convictions stemming from violent behaviors, had multiple relief-from-abuse complaints filed against him, and had been substantiated recently for risk of harm to children.  When DCF had discussed this history with mother shortly before L.D.'s birth, she stated that she had no concerns about father's violent behavior.  Now both parents explicitly acknowledged that their lack of insight around father's history of violent behavior and anger management issues placed L.D. at risk of harm.

In early June 2019, DCF moved to vacate the conditional custody order and place L.D. in DCF custody based on concerns that L.D. had failed to thrive while in mother's care.  The court granted DCF's motion.  It found that L.D. was failing to gain weight normally and had to be hospitalized twice while in mother's care.  L.D. was placed with one foster family, but then

moved to another foster home to accommodate parents' new home in another county. The second foster parents were verbally abusive to children in the home and physically aggressive with L.D., and L.D. suffered some trauma there either by observing or experiencing abuse. She was moved to a third foster home in August 2020, where she has since remained.

DCF filed a proposed disposition case plan in July 2019, which the court adopted with some modifications in October 2019. The case plan set a goal of reunification with both parents in three to six months. DCF had originally proposed reunification with both parents or with mother if they separated. However, mother made clear there was no plan for separation and wanted that alternative goal removed, which the court ordered. The case plan required that L.D. "live in a home that is safe under the care of adults who are able to demonstrate acts of protection and supportive behaviors" including the ability to recognize her cues and age-appropriate responses. Mother's service plan required her, among other things, to engage in Family Time Coaching, demonstrate that she could meet L.D.'s needs, sign releases, demonstrate the ability to provide for L.D. financially, provide a safe and stable home, and attend her medical appointments. Father shared the same requirements but also needed to address his threatening and violent behaviors, complete a risk assessment, and follow any resulting recommendations. The case plan warned that if father did not address his unsafe behaviors and mother and father could not show that they were able to meet L.D.'s needs and ameliorate the risks that resulted in DCF involvement, then DCF would recommend an alternative permanency plan such as termination of parental rights and adoption.

DCF petitioned to terminate both parents' parental rights in July 2020. The court held four days of hearings in October 2021 and January and February 2022. In June 2022, it issued an order terminating both parents' parental rights, including written findings of fact and conclusions of law. The court noted father's long history of abusive behavior, much of which father admitted to. For example, father admitted that in 2017 he fired an unloaded BB gun on the leg of his then-girlfriend's six-year-old child and later yelled at her two-year-old that if the child screamed one more time he would "slam [her] against the wall." It found that there had not been physical abuse of mother so far during their relationship and that father had not violated any court orders or physically threatened anyone involved in this case. The court was concerned, however, about father's emotional stability and ability to care for a child based on his emotional outbursts during the case and inappropriate comments toward L.D. For instance, during DCF supervised visits in 2019 and 2020, he repeatedly used profane and derogatory language toward L.D. while refusing to meet her needs in the moment. The court was also troubled by a psychological risk assessment that father was "emotionally incompetent" and had limited ability to control his behavior when under stress. It noted that father had attended mental health counseling, participated in Family Time Coaching, and completed many of the steps outlined in his case plan. The court found that he had made progress in controlling his physical behavior and did not pose a threat of violence to mother or L.D. But the court found father had not made sufficient progress in his ability to parent L.D. in an emotionally safe way. It found he continued to have limited understanding of her needs and how his behavior might impact her development. Father admitted he had not bonded well with L.D. She continued to be reluctant to go to her weekly visits with parents and, during those visits, bonded quickly with mother but not with father. Upon returning to her foster home, L.D. typically had a troubling reaction, including nightmares and aggressive behavior.

As to mother, the court found that she had essentially followed her action steps. She had demonstrated a good understanding of L.D.'s developmental needs and ability to care for her individually. She also understood when father was engaging in inappropriate behavior or had

unrealistic expectations of L.D.'s developmental capabilities, and she tried to advise or redirect him in those instances. However, the court was concerned that mother too often "had to be in the role of parent to [father] as well as [L.D.]." The court found that throughout the case mother remained unwilling or unable to understand father's limitations as a parent to L.D. and how those limitations negatively impact L.D. In particular, it found that mother resisted significant contact between L.D. and herself that did not involve father. DCF made clear that mother's chances of obtaining custody rested in part on her agreeing to separate from father, which she refused to do. The parents' plan, if custody was returned to them, was for father to be the primary caretaker while mother worked. The court found that parents failed to recognize that L.D. would not feel safe in father's care and that father did not have the skills to primarily care for L.D.

The court concluded that there was a change in circumstances based on stagnation. It noted the case plan had a reunification date of three-to-six months. Now, two-and-a-half years after the plan was adopted, parents had still not progressed to unsupervised contact and L.D. continued to react to visits with significant emotional distress. As evidenced by parents' plan for father to be the primary parent while mother worked, mother did not understand the risks to L.D. posed by father's lack of parenting skills and inability to control his emotions. Accordingly, the court concluded that mother and father had stagnated in their ability to parent.

The court then analyzed all of the statutory best-interests factors and determined that clear and convincing evidence supported terminating mother's and father's parental rights. As to mother, it found that she appeared to have a strong bond with L.D., but their time together was compromised by the conflicted bond between L.D. and father. Because L.D. continued to be fearful or extremely confused by the prospect of visits, which were still only once per week, the court found the overall bond between L.D. and parents was limited. By contrast, L.D. had developed a very strong and loving attachment to her foster parents, who indicated their unequivocal intent to adopt L.D. if released for adoption. The court determined that breaking this bond would be very damaging to L.D. It found that mother had not developed a plan to keep L.D. emotionally safe if L.D. lived with both her and father. Now three years old, L.D. had a dire need for permanency with a family that was ready and able to parent her. The court found that given L.D.'s age and needs and parents' insistence that their contact with L.D. be as a unit, parents would not be able to resume parental responsibilities within a reasonable time. It ultimately concluded that termination of mother's and father's parental rights was in L.D.'s best interests.

On appeal, mother first argues that the court erred in concluding that mother's progress had stagnated and termination of parental rights was in L.D.'s best interests because these determinations were based entirely on father's conduct. We disagree. So long as the family division applied the correct legal standards, we will affirm its conclusions if supported by the findings and uphold the findings unless clearly erroneous. In re A.F., 160 Vt. 175, 178 (1993). To terminate parental rights after an initial disposition order is in place, the family division must first determine by clear and convincing evidence that there was a "change in circumstances." 33 V.S.A. § 5113(b). A change in circumstances is "most often found when the parent's ability to care properly for the child has either stagnated or deteriorated." In re M.M., 159 Vt. 517, 521 (1993). If it concludes there has been a change in circumstances, then it must determine whether termination is in the child's best interests after considering the statutory factors. 33 V.S.A. § 5114(a).

Mother argues that the court failed to consider each parent individually and improperly terminated parental rights based on father's conduct, which was beyond her control. To the

3

contrary, the family division thoroughly considered mother and father individually and as a unit. The court noted that mother would have been an effective parent to L.D. individually, but she made clear that she intended to cohabitate and coparent with father, who poses a significant emotional safety risk to L.D. In fact, mother planned to have father be the primary parent for L.D. while mother worked. Mother does not contest these findings on appeal. Thus, it would have been inappropriate for the court to consider mother's fitness as a parent in isolation. The family division's job in termination-of-parental-rights proceedings is not to consider theoretical scenarios that neither party is willing to pursue or to balance a parent's rights against the child's. Rather, its primary focus is on the child's safety and permanency. In re A.G., 2004 VT 125, ¶ 17, 178 Vt. 7. The court found, and mother does not dispute, that L.D. was having an "extraordinarily difficult time . . . transitioning to visits with her parents as well as . . . emotional upheaval in the days after visits." It was incumbent on the court to analyze the parenting dynamic chosen by mother, which included visits with father as well as a plan for father to frequently parent alone, and consider what effect this arrangement would have on L.D. Under these circumstances, the court did not err by basing its stagnation and termination decisions regarding mother primarily on the risks to L.D. posed by father, which mother was well aware of.

Mother also contends that the court deprived her of due process and erroneously based its decision on factors outside of her control because she was not on notice that her parental rights could be terminated for failing to control or respond properly to father's deficiencies. She does not explain whether and how she preserved this argument for review, which warrants rejection of the argument. See Bull v. Pinkham Eng'g Assocs., 170 Vt. 450, 459 (2000) ("Contentions not raised or fairly presented to the trial court are not preserved for appeal."). To the extent mother did preserve this contention, however, it fails on its merits.

Parents are entitled to due process in termination proceedings, including notice of the fact that the State is seeking to terminate parental rights and the grounds on which termination is sought. In re H.A., 153 Vt. 504, 509-10 (1990). The record here establishes that mother was on notice from the outset of the case that father's behavior put L.D., and mother's custody of L.D., at risk. Mother stipulated that L.D. was a CHINS less than a month after birth in part because mother acknowledged that her lack of insight regarding father's history of violent behavior and anger management issues placed L.D. at risk of harm. DCF's case plan, first proposed in July 2019, explicitly warned mother that if she could not demonstrate the ability to meet L.D.'s needs and ameliorate the risks that resulted in DCF involvement, then DCF would recommend an alternative permanency plan such as termination of parental rights and adoption. See In re D.M., 176 Vt. 639, 640 (2004) (mem.) ("The key question for the court when considering whether stagnation has occurred is whether the parent has made progress in ameliorating the conditions that led to state intervention."). The case plan also emphasized at numerous points the importance of ensuring a physically and emotionally safe home environment for L.D. Although mother contends the court erred in finding that DCF clearly informed her that she needed to separate from father to regain custody, she testified at the termination-of-parental-rights hearing that DCF told her in the fall of 2019 that she would have a better chance of retaining custody of L.D. without father.

Mother also argues that the court found deficiencies in DCF's efforts to facilitate mother's individual parenting, which demonstrate her lack of notice of DCF's expectations and render the court's conclusions regarding stagnation and termination of parental rights unsound. In particular, mother cites the court's "hope[] that DCF might [have] work[ed] more closely with [mother]" to figure out how to address the "conflicting bind she has given her love for both

4

[L.D.] and [father]," and its finding that it was unclear whether DCF offered mother individual visits. Neither of these statements in the court's decision detracts from the ample notice provided to mother that her parental rights were at risk if father did not make sufficient progress and she chose to coparent and cohabitate with him. See In re D.S., 2016 VT 130, ¶ 7, 204 Vt. 44 (holding that DCF provided adequate notice of expectations despite deficiencies in case plan because "the necessary changes were apparent from the factors leading to DCF custody, the parents' identified areas of risk, and the objectives detailed in the case plan"). And whether DCF made reasonable efforts to assist mother "is a separate question from whether termination is in the child's best interests and the former is not a prerequisite to the latter." In re C.P., 2012 VT 100, ¶ 38, 193 Vt. 29. Mother had notice consistent with due process of the grounds on which the State sought to terminate her parental rights, and the court's ultimate decision was based on factors within her control.

Affirmed.

BY THE COURT:

_____
Paul L. Reiber, Chief Justice


_____
Harold E. Eaton, Jr., Associate Justice


_____
Karen R. Carroll, Associate Justice