*Note: Decisions of a three-justice panel are not to be considered as precedent before any tribunal.*

## ENTRY ORDER

SUPREME COURT DOCKET NO. 2013-440

MARCH TERM, 2014

| | |
|---|---|
| In re T.F. and B.F., Juveniles | } APPEALED FROM: |
| | } |
| | } Superior Court, Caledonia Unit, |
| | } Family Division |
| | } |
| | } DOCKET NO. 39/40-3-12 Cajv |
| | |
| | Trial Judge: Walter M. Morris, Jr. |

In the above-entitled cause, the Clerk will enter:

Mother appeals the termination of her parental rights with respect to two of her children, T.F. and B.F. We affirm.

Mother does not dispute any of the trial court's findings, which reveal the following facts. T.F. was born in May 2005, and B.F. was born in December 2008. Mother and T.F.'s father married in July 2005 and separated in November 2009.[*] The relationship involved chronic physical and emotional abuse of mother by the father, and the children were exposed to that abuse. Included in the household at that time were two older boys, who were also mother's biological children. One lives with his father, and the other died of cancer in early 2011.

The Department for Children and Families (DCF) first became involved with the family in 2006. Over the following seven years, DCF opened three separate cases in which it offered the family services to address, among other things: (1) mother's and her partners' inappropriate use of physical discipline; (2) mother's inability to manage the children's behaviors or provide them with a safe and stable home; and (3) mother's inability to meet the children's nutritional, hygienic, and clothing needs. In March 2012, DCF filed petitions alleging that T.F. and B.F. were children in need of care or supervision (CHINS). Following an April 12, 2012 temporary care hearing, in which the parties stipulated to the CHINS allegations, the family division of the superior court transferred the children to DCF custody. DCF then placed the children with the maternal grandparents, with whom they still live.

At a June 18, 2012 disposition hearing, at which DCF presented a case plan recommending concurrent goals of reunification with mother or exploration of kinship options for guardianship or adoption, the parties stipulated to continued DCF custody. The court approved the case plan, which required mother to: (1) maintain safe, stable and permanent housing; (2) meet with her social worker and openly communicate with DCF on a consistent basis; (3) participate in Family Time Coaching regarding visits with the children; (4) permit DCF

---

[*] T.F.'s father opposed the termination of his parental rights at the termination hearing, but has not appealed the termination order. B.F.'s father voluntarily relinquished his parental rights at the onset of the termination hearing.

to make unscheduled home visits; (5) work with support groups to address her parenting skills, including learning to recognize situations and persons posing risks to the children; and (6) sign all releases to help DCF work with service providers. The critical issues that the case plan sought to address were mother's lack of adequate supervision of the children and her association with others who posed a risk of harm to the children.

Mother attended the Family Time Coaching sessions reliably, and was generally capable of managing the children during visits in a supervised setting with support from service providers. But as unsupported parent-child contact progressed, the children's behaviors regressed and mother was unable, without assistance, to manage those behaviors or to meet the children's needs. Beginning in September 2012, a weekly schedule was put in place for the children to spend a day and a night with her. As this schedule progressed, the children's behaviors became more unmanageable, and the maternal grandparents often had to go to mother's apartment to take the children home with them. In November 2012, the children were supposed to begin spending weekends with mother, but mother displayed limited insight into their challenging behaviors and little ability to address their needs, and had to call the maternal grandparents to ask them to take the children back to their home. Further, mother continued to permit people to come and go from her apartment without knowing who they were or the risks that they potentially posed to the children. In fact, some of those people did present a risk of harm to the children.

In January 2013, DCF filed petitions to terminate the parental rights of mother and the fathers of T.F. and B.F. Following a two-day hearing in May 2013, the court terminated mother's parental rights. The court first found, by clear and convincing evidence, that mother's ability to parent the children had actually regressed rather than progressed in the previous sixteen months, despite her having received extensive services over a period of years to address her parenting deficiencies. The court further found that mother was unable to respond to the children's profound emotional and behavioral needs, and that the children's behaviors and emotional well-being progressively deteriorated as mother moved to more independent supervision of them during periods of unsupervised contact. Based on these and other findings, the court found that a substantial change of circumstances was established through stagnation in her progress toward reunification with the children.

Addressing the best interests of the children, the court acknowledged that mother and the children loved each other and had formed a bond, and that mother was by all accounts a kind person. However, it concluded that she was unable at the time, and likely would not be able within a reasonable period of time from the perspective of the children, to provide the children with the significant physical and emotional support that they required. The court emphasized the children's pronounced and serious behavioral and emotional disorders, and their absolute and immediate need for stability, consistency, insight, patience, and endurance from their caregivers, which had been provided admirably by the maternal grandparents for the previous sixteen months. The court found that mother lacked insight into the children's needs or how her actions had affected them. The court described mother's relationship with the children as "tenuous" because of her inability to meet the children's, or her own, essential needs for emotional health and safety. According to the court, the maternal grandparents were serving as the children's physical and emotional parents, and the children required permanency in that relationship. Accordingly, the court granted the State's petition to terminate mother's parental rights.

On appeal, mother argues that the court's termination order lacks a rational basis because, although the court's order notes the importance of the children's ongoing contact with their maternal grandparents, as well as with their mother, the termination order ensures neither that the children will be adopted by the maternal grandparents nor that the maternal grandparents will allow continued contact with mother. In mother's view, these goals would have been better served by one of the following three options:

> (1) transfer custody directly to the maternal grandparents without limitation to adoption, see In re J.G., 2010 VT 61, ¶¶ 12-15, 188 Vt. 562 (mem.) (concluding that family court has authority to transfer residual parental rights to individual rather than DCF);

> (2) transfer legal custody or legal guardianship to the maternal grandparents while providing parent-child contact with mother, see 33 V.S.A. § 5318(a)(7) (listing as one available disposition order transfer of custody to relative or other person with whom child has significant relationship, with the option of providing parent-child contact with one or both parents); id. § 5321(a)(4) (listing legal guardianship as one of possible goals to be set forth at permanency hearing); or

> (3) grant the maternal grandparents a permanent guardianship, id. § 5318(a)(6) (listing as one available disposition order establishment of permanent guardianship pursuant to 14 V.S.A. § 2664); id. § 5321(a)(4) (listing permanent guardianship as one of possible goals to be set forth at permanency hearing).

According to mother, given the testimony of a DCF caseworker indicating her mistaken belief that children had to be at least twelve years of age to qualify for a permanent guardianship, see 14 V.S.A. § 2664(a)(3)(A) (stating that children under twelve may qualify for permanent guardianship if proposed guardian is a relative), the maternal grandparents most likely were never informed of that possibility. She surmises that if they had known of such a possibility, they may well have declined to adopt the children, making the third option (permanent guardianship) possible. See 14 V.S.A. § 2664(a)(2) (stating as one of requirements for establishing permanent guardianship that court find by clear and convincing evidence that "[n]either returning the child to the parents nor adoption of the child is likely within a reasonable period of time"); In re A.S., 171 Vt. 369, 373 (2000) (stating that "reasonably likely" requirement of § 2664(a)(3)(A) is satisfied if "the foster family has expressed a willingness and a desire to adopt").

We conclude that the family court's termination order is consistent with the law, as well as with the court's conclusion, which is supported by its findings and the evidence presented at the termination hearing. While the options identified by mother may have been among the range of dispositions available to the court, the court did not abuse its discretion in ordering termination in this case. Mother speculates that the grandparents would have refused to adopt the children so as to allow a permanent guardianship, but the court found that they were committed to the children " 'for the duration'—for permanency in the form of adoption," and nothing in the record suggests that they would have preferred a permanent guardianship over adoption. Further, the DCF social worker did not mistakenly believe that statutory law precluded

establishing a kinship permanent guardianship for children under twelve; rather, she testified that DCF generally does not advocate for permanent guardianships for children this young.

More importantly, once the court has properly applied the statutory factors and determined that termination of parental rights is in the children's best interests, it is not required to address and rule out each of the other potential disposition options. In re T.T., 2005 VT 30, ¶ 7, 178 Vt. 496 (mem.). Although the court expressed confidence in the maternal grandparents' parenting abilities and commitment to the children, on the basis of the court's findings more broadly, we do not infer that the court's conclusion that termination and permanency through adoption were in these children's best interests was conditioned upon adoption only by maternal grandparents. Likewise, although the court expressed approval that the likely post-termination outcome—adoption by maternal grandparents—would facilitate some ongoing contact between the children and the mother they loved, we find no indication in the court's opinion that it's termination order was based on this expectation.

Affirmed.

BY THE COURT:

_____
Paul L. Reiber, Chief Justice

_____
John A. Dooley, Associate Justice

_____
Beth Robinson, Associate Justice