NOTICE: This opinion is subject to motions for reargument under V.R.A.P. 40 as well as formal revision before publication in the Vermont Reports. Readers are requested to notify the Reporter of Decisions by email at: JUD.Reporter@vermont.gov or by mail at: Vermont Supreme Court, 109 State Street, Montpelier, Vermont 05609-0801, of any errors in order that corrections may be made before this opinion goes to press.

2016 VT 23

No. 2015-321

| | |
|---|---|
| In re T.M. and A.M., Juveniles | Supreme Court |
| | On Appeal from<br>Superior Court, Windsor Unit,<br>Family Division |
| | December Term, 2015 |

Howard A. Kalfus, Acting J., Specially Assigned

Matthew Valerio, Defender General, and Rebecca Turner, Appellate Defender, Montpelier, for Appellant Father.

William H. Sorrell, Attorney General, Montpelier, and Joseph L. Winn, Assistant Attorney General, Waterbury, for Appellee Department for Children and Families.

Michael Rose, St. Albans, for Appellees Juveniles.

PRESENT: Reiber, C.J., Dooley, Skoglund and Robinson, JJ., and Morris, Supr. J. (Ret.), Specially Assigned

¶ 1.    **ROBINSON, J.**    Father appeals an order of the superior court, family division, terminating his parental rights with respect to his two children, A.M. and T.M. We conclude that the State failed to meet its threshold burden of demonstrating by clear and convincing evidence that sufficient changed circumstances existed to modify the previous disposition order establishing concurrent goals of reunification and adoption and accordingly reverse.[1]

_____

[1] Mother voluntarily relinquished her parental rights and is not a party to this appeal.

¶ 2.     A.M. was born in January 2011, and T.M. was born in September 2012.  T.M. has a diagnosis of spina bifida (split spine), a permanent birth defect that causes nerve damage and other disabilities.  The Department for Families and Children (DCF) first became involved with the family in the summer of 2012 after a conditional custody order (CCO) was issued because of concerns over the parents' drug use, particularly the mother's use while pregnant with T.M.  The CCO required the parents to be substance free, to participate in counseling, and to follow through with T.M.'s medical appointments and A.M.'s daycare.  The parents were successful with the CCO, and it was discharged in May 2013; however, DCF maintained an open case with the family, which involved home visits and a family safety plan.

¶ 3.     In the fall of 2013, DCF began having renewed concerns about the family because of missed medical appointments for T.M., inconsistent daycare, the mother's depression, and father's admission to using alcohol and marijuana.  DCF sought a court hearing to determine the best way to address its concerns.  When DCF called father to advise him that a court date was set, he threatened to remove the children to Florida.  At that point, DCF sought emergency custody and filed a petition alleging that the children were in need of care or supervision (CHINS).  On February 21, 2014, the court issued an order transferring custody of the children to DCF.  At the April 2, 2014 merits hearing, the mother and father stipulated to a finding of CHINS, agreeing "that the children were and are in need of care and supervision due to their parents' substance use and how it interferes with parenting of the children."

¶ 4.     Two days after the court's merits order, and before the disposition hearing, father checked in to the Brattleboro Retreat for detoxification.  He began Suboxone treatment while at the Retreat and continued that treatment at an outpatient facility immediately after his April 10, 2014 discharge.

¶ 5.     The court's May 12, 2014 disposition order continued legal custody of the children with DCF, maintained their kinship placement with the paternal grandmother, and

2

established concurrent case plan goals of either reunification with the parents or adoption. The plan required parents to find appropriate housing and to establish financial stability through employment and Medicaid benefits. In addition, they were to engage in "the appropriate level of treatment with clinicians experienced in the outlined areas of need." In particular, the plan required father to continue his daily Suboxone treatment, to continue all substance abuse treatment and follow all recommendations, to provide DCF with regular urine screens, and to continue his individual therapy. It also required him to demonstrate an ability to supervise and monitor the children appropriately, to demonstrate an ability to put their needs before his own, and to work with a parent educator in Family Time Coaching to gain a better understanding of the children's needs. The disposition case plan identified November 2014 as an estimated date for achieving the case plan goals.

¶ 6. On October 31, 2014, DCF filed a petition to terminate the mother's and father's parental rights as to both children. At a January 2015 hearing, mother voluntarily relinquished her parental rights to the children.

¶ 7. Around the time of DCF's termination petitions, the children's current foster parents began providing respite care. That care extended to six days a week by the end of December, and in March 2015 the former respite caregivers officially became the children's foster parents.

¶ 8. The court held an evidentiary hearing on August 10 and 11, 2015. We review the evidence presented at that hearing in detail below. At the conclusion of that hearing, the court terminated father's parental rights. The court concluded that, although father had made significant progress in certain areas of his life, his continued substance use amounted to stagnation and thus constituted changed circumstances warranting reconsideration of the plan of reunification. The court further concluded that father's use of illicit substances and his failure to take responsibility for that conduct precluded him from being able to assume parental duties

3

within a reasonable period of time from the perspective of the children, who had been in DCF custody for eighteen months, and that termination of father's parental rights was in the children's best interests.

¶ 9.    The trial court made the following specific oral findings from the bench at the conclusion of the termination hearing: (1) the explicit basis of the CHINS finding in April 2014 was that the parents were using substances that were interfering with their ability to care for the children; (2) T.M. has extraordinary needs; (3) the adopted disposition case plan addressed expectations concerning housing, financial stability, mental health needs, substance abuse, parenting, and accountability; (4) by the fall of 2014, father had found housing, was employed, was very engaged in family time coaching, and was enjoying regular contact, including daily phone contact, with the children while they were living with his mother; (5) after the children were transitioned to the foster parents, contact between the children and father was reduced; (6) father was understandably frustrated by the reduced contact with his children, but with one exception, never petitioned the court for more contact time; (7) father wanted to continue family time coaching, but DCF discontinued the opportunity after filing its termination petition; (8) for the year leading up to the termination hearing, father maintained stable employment and housing; (9) during that year, he also took advantage of as much contact with the children as he could; (10) the substance abuse that formed the basis of the CHINS petitioned remained inadequately addressed, with the evidence showing continued use over a long period of time; (11) father was not honest about the extent of his drug use; and (12) father's testimony that he had found marijuana on the sidewalk was not credible.

¶ 10.    Based on these findings, the family court stated that it had "no confidence that [father] has addressed the single issue that led to the children coming into custody to begin with."    Therefore, the court found stagnation "despite the other very significant gains that

4

[father] has made" and the fact that the children love him, he loves them, he has demonstrated "this affection at every opportunity," and his contact with them "seems to be beneficial to them."

¶ 11. On appeal, father argues that the evidentiary record does not support either the court's threshold finding of changed circumstances or its conclusion that father would be unable to resume his parental duties within a reasonable period of time. With respect to changed circumstances, father contends that because he satisfied all of the goals set forth in the disposition case plan and remedied the circumstances that led to his children being taken into state custody, neither the record nor the family court's findings support the court's determination that circumstances had changed based on stagnation of his ability to parent.

¶ 12. In considering a petition to modify a previous disposition order and terminate parental rights, the family court must first determine that there has been a material change in circumstances in the children's lives. In re D.M., 2004 VT 41, ¶ 5, 176 Vt. 639, 852 A.2d 588 (mem.). "The change of circumstances most commonly found in termination cases . . . is parental stagnation," which "may be found if the parent has not made the progress expected in the plan of services for the family despite the passage of time." Id. As we stated in D.M.:

> The key question for the court when considering whether stagnation has occurred is whether the parent has made progress in ameliorating the conditions that led to state intervention. The [DCF] case plan is not intended to be a mere checklist the parent must satisfy to ensure the automatic return of the children to the parent's care, however. . . . [E]ven if a parent participates in every program set forth in [DCF]'s plan, the main concern must always be whether the individual parent has demonstrated the improvement contemplated at the time the children were removed from the parent's care.

Id. ¶ 7.

¶ 13. The State must demonstrate, and the family court must find, stagnation by clear and convincing evidence before the court may consider whether termination of parental rights is in the children's best interests. In re R.W., 2011 VT 124, ¶ 15, 191 Vt. 108, 39 A.3d 682. The

5

stringent clear-and-convincing evidence standard in termination proceedings reflects the United States Supreme Court's judgment that the risk of erroneous termination of parental rights is a greater concern than the risk of erroneous failure to terminate those rights because although "the likely consequence of an erroneous failure to terminate is preservation of an uneasy status quo" for the child, "the consequence of an erroneous termination [for the parents] is the unnecessary destruction of their . . . family." Santosky v. Kramer, 455 U.S. 745, 765-66 (1982); see In re T.E., 155 Vt. 172, 582 A.2d 160, 162 (1990) (noting that "due process requires that a higher standard—clear and convincing evidence—be imposed on the State whenever it seeks permanently to sever what has been described as '[t]he fundamental liberty interest of . . . parents in the care, custody, and management of their child' " (quoting Santosky, 455 U.S. at 753)).

¶ 14. The first question we must address on appeal is whether the evidence supports the trial court's finding of changed circumstances. The State does not dispute that father met most of the goals of the case plan: he had steady full-time employment, had found stable and suitable housing, and had a loving and appropriate relationship with the children when he was able to see them. The central rationale for the family court's finding of stagnation—as well as its ultimate termination decision—was that father continued to use illicit drugs and failed to take responsibility for his actions, and that his conduct reflected a failure to progress in his substance abuse treatment as contemplated by the case plan. Accordingly, we review the evidence offered at the final hearing in support of this conclusion.

¶ 15. At the termination hearing, the State elicited father's testimony concerning his progress in drug treatment. Father testified that he spent about a week at the Brattleboro Retreat when the children were taken into DCF custody in February 2014, after which he was placed in a program that supplied him with an opiate replacement and required him to be subjected to random drug testing on a regular basis. Father further testified that because of the difficulty of

6

getting to that program every day, beginning in July 2014 he entered into another program in which drug testing and group discussion sessions were done on a weekly basis.

¶ 16.    The State's primary evidence that father continued to engage in illicit substance abuse was found in records of his weekly meetings at the latter program for opioid dependency, which were admitted by stipulation as the State's exhibit 7.  The exhibit consists of single-page weekly clinical reports relating to his substance abuse treatment from July 2014 through July 2015.    The reports consist of an explanation of the scheduled topics for the weekly group discussion, the drug testing results, and notes of any personal issues discussed by the participant in the group.    The drug testing results amounted to circling any of the ten three-letter abbreviations of drugs listed on the form for which the participant tested positive.  The ten listed drugs are: AMP, BAR, BZO, BUP, COC, MTD, MET, OPI-3000, OXY, THC.    From January through April, 2015, "THC" was circled on most of the weekly reports, and several reports reflect father's admission to smoking marijuana.    There was no indication of "THC" consumption in the two months preceding the termination hearing.    In three of the records from May and early June of 2015, "AMP" is circled.    The first note indicates, "AMP may be a false positive."    The second, which also reflects a positive test for "MET" notes, "[c]ontinue to monitor UDS results to see if a pattern emerges."    The clinical notes reflect that father denied amphetamine use.[2]

¶ 17.    In his own testimony, father confirmed that he tested positive for buprenorphine every week because that was the opiate replacement he was using in his treatment program.

_____

[2]    Because the termination hearing was in August 2015, we focus on the records documenting father's progress in substance abuse treatment during the seven months preceding that hearing.    The records also appear to reflect two positive tests for "OXY," once in August 2014 and once in September 2014, a positive test for BZO in August 2014, a positive test for "OPI-3000" in September 2014, and three positive tests for THC in November and December of 2014.  Because the focus of the termination hearing was father's progress and the children's best interests at the time of termination, the State's evidence relating to the months preceding the termination order is most probative.

7

Father downplayed his use of marijuana, testifying initially that he had used it on only a couple of occasions and later that he had used it occasionally in the past to sleep. In his testimony, father did not admit to amphetamine use, and he testified that the purported positive finding of "MET," which he understood to refer to methadone, made no sense given because one cannot take methadone with the other medications he was taking.

¶ 18. No witness for the State testified as to the meaning or reliability of the reports. Indeed, the Assistant Attorney General (AAG) representing the State appears to have examined father himself to establish the meaning of the reports. The AAG first asked father what "UPS Results" meant on the report. Father responded: "I'm guessing it's urine analysis." Father then responded in the affirmative when the AAG asked him whether the abbreviated names of substances that were circled were the ones for which he testified positive. As the AAG moved through the weekly reports, he asked father on more than one occasion what drug the three-letter abbreviation stood for. For example, the AAG asked father: "What is BZO?" Father responded that he assumed it was "Benzo." At one point, when the AAG asked father if he tested positive for opiates, father asked if OPI meant opiates, and the AAG responded: "I assume so." At another point, the AAG asked defendant if he knew what meth was. Father responded that he thought it stood for methadone and then started to explain how he could not possibly have tested positive for that drug because it could not be taken with another drug—presumably his opiate replacement—at which point the AAG cut him off. There were other instances of father acknowledging a test result but questioning its validity.

¶ 19. Moreover, and more significantly, there was no evidence connecting the test findings to father's progress in substance abuse treatment, or to his parenting. The records on their face do not contain any notes reflecting a clinical judgment by the clinicians who ran the group in which father participated, or the physician who countersigned some notes, that father was falling short of expectations with respect to his treatment or that he was failing in the

8

program. In fact, seven of the nine clinical notes preceding the termination hearing begin with the statement, "No concerns." The other two state, "Continue to monitor UDS results." No clinician testified that father was not progressing satisfactorily in his treatment program, and this is not a case in which a parent charged with participating in and successfully completing a substance abuse treatment program has been discharged for failing to comply with program requirements. Nor did the DCF case worker testify about the meaning of the treatment notes or their significance with respect to the case plan goals.[3]

¶ 20. In the face of this record, we cannot conclude that the State has proven stagnation by clear and convincing evidence. Father's admitted and apparently documented marijuana use through the winter and spring of 2015, and the three notes possibly reflecting positive tests for amphetamines, may indicate that he is not progressing as expected in his addiction treatment program, that he has failed to meet the expectations of the case plan, that he is unable to resume parental responsibilities within a reasonable time, and that the best interests of the children require termination of his parental rights. But these conclusions are not self-evident on the basis of the clinical records alone, and the State failed to present any additional evidence to demonstrate the significance of those records.

¶ 21. We are unpersuaded by the State's argument that the children were taken into state custody primarily because of the parents' drug use, which was interfering with the parents' ability to care for the children, and that any evidence of continued use of illicit substances reflects an ongoing substance abuse problem, and therefore stagnation. Given the cycle of forward progress and backsliding that individuals in treatment for substance abuse often go

---

[3] The State elicited testimony from the DCF caseworker that father had denied any substance use, and that that was a "huge concern" because it "puts him in a pre-contemplative state of substance recovery, which is not a place where we want parents to be when we're talking about reunification." She explained that it makes it difficult to "assess safety in [his] home around substance use when he's not being honest about what that use looks like." This is as close as the State got to explaining the significance of any continued drug use by father with respect to his ability to parent.

9

through, we cannot assume that any and all evidence of substance abuse by a parent in treatment is indicative of stagnation. And without evidence to support such an inference, we cannot assume that all "substance abuse" is the same with respect to the case plan goals and father's ability to parent. We do not mean to suggest that the State has to provide the testimony of a pharmacologist in every case dealing with substance abuse. Substance abuse clinicians, or even DCF social workers upon proper foundation and qualification in a given case, may offer pertinent testimony, consistent with the evidentiary standards which prevail in TPR proceedings. Here, there was a substantial failure of competent proof as to a key component of the court's stagnation calculus. There was no direct evidence as to what drugs father was using at the time of the merits hearing, and to what extent, but we infer that father was addicted to opiates because he began taking an opiate replacement medication when he entered the Brattleboro Retreat soon after the children were taken into State custody. By contrast, the substance abuse at issue in the termination hearing was primarily marijuana use, and possibly amphetamine use. The State did not present any evidence on the impact of marijuana use on his ability to successfully overcome his opiate addiction or to parent his children.

¶ 22. Likewise, we reject the conclusion that father's minimization of his marijuana use, as distinct from the use itself, supports a finding of stagnation on this record. In finding stagnation, the family court relied in part on its finding that father was not honest in testifying initially that he smoked marijuana during the previous year on only a couple of occasions, when the test results and father's own admissions as reflected in the clinical records indicated positive THC tests over a period of months. Again, though, without more testimony to explain those findings (including an explanation of how long a single instance of THC consumption is reflected in positive blood tests), it is not clear how great the gap is between father's acknowledged use and his actual use. Moreover, with the exception of the brief statement of the DCF caseworker noted above, the court received no evidence concerning how father's failure to

10

acknowledge the full extent of his marijuana use impacted his recovery from opiate addiction or his ability to parent.

¶ 23. Our holding in this case is narrow and closely tied to the facts of this case. Taken in the light most favorable to the State, the evidence reflects that father reliably participated in his substance abuse treatment for over a year and complied with the Suboxone regime and abstained from illicit opioids. The trial court found that he got and maintained housing starting in the fall of 2014 and made it habitable, and that he got and kept a stable full time job with the children's interests at heart. Father undisputedly spent as much time with his children as permitted, never missed a family time coaching session, and had a demonstrated bond with his children.[4] We acknowledge that the DCF case plan is not intended to be a mere checklist the parent must satisfy to ensure the automatic return of children to the parent's care. See In re D.M. & T.P., 2004 VT 41, ¶ 7. Even if a parent participates in every program set forth in DCF's plan, the main concern must always be whether the individual parent has demonstrated the improvement contemplated at the time the children were removed from the parent's care. In this case, however, the trial court specifically found that father has played and continues to play a constructive role in the children's lives, and that "there has never been any question about the level of affection and emotional support" that he is willing to give his children. Given these

_____

[4] The record reflects, and the trial court found, that father had regular visits with the children while they lived with his mother and spoke to them over the phone almost daily. As the children spent more time with the respite care providers who became their foster parents, to his great frustration, father was offered fewer opportunities to visit, and the phone calls ceased almost entirely. Visits that had been unsupervised in the community twice per week were reduced several times to a schedule of one supervised visit per week. At the same time, despite father's pleas for continued family time coaching, DCF made a policy decision to stop providing the service once it filed its TPR petitions—even though the court-ordered disposition and case plan remained in place pending the termination hearing. Because we decide this case on the grounds set forth above, we do not address the evidence and findings relating to conflict between the foster care providers and father, and the impact on his contact with his children. We do echo the trial court's conclusion that in the face of evidence that the family time coaching was benefitting the children, DCF's decision to stop family time coaching prior to the granting of the TPR was regrettable.

11

facts, it is not obvious, without more evidence, that his use of an undetermined amount of marijuana throughout part of the period preceding the termination hearing reflects such a substantial departure from the case plan goals with respect to his progress in improving his capacity to resume his parental responsibilities that it amounts to stagnation. Moreover, the reliability and significance of the three positive "AMP" tests are left to conjecture in the absence of any testimony addressing these records. On this record, the inferences required to support the trial court's conclusion as to stagnation and changed circumstances are not supported by clear and convincing evidence.[5]

Reversed.

FOR THE COURT:

_____
Associate Justice

¶ 24. **REIBER, C.J., dissenting.** The trial court acted within its discretion in concluding that there had been a change of circumstances, and we should affirm its judgment. As the trial court found, the children were taken into state custody based on parents' substance use and their resulting inability to parent. Throughout the eighteen months leading up to the termination hearing, father continued to use substances. Father does not dispute this finding. The court reasonably concluded that father's ongoing substance use, coupled with his inability to acknowledge and address this issue, demonstrated a failure to comply with the goals of the case plan and established that father had stagnated in his ability to resume parenting.

---

[5] Because we reverse the trial court's threshold conclusion as to stagnation, we do not address father's arguments concerning the trial court's best interests analysis, nor his challenge to certain evidentiary rulings excluding evidence of particular events arguably reflecting on the children's safety in their foster home.

¶ 25. As the trial court recognized, there must be a "change in circumstances" before the court may modify a disposition order. 33 V.S.A. § 5113(b) (stating that court "may amend, modify, set aside, or vacate an order on the grounds that a change in circumstances requires such action to serve the best interests of the child"). "A substantial change in material circumstances is most often found when the parent's ability to care properly for the children has stagnated." In re D.C., 168 Vt. 1, 4, 712 A.2d 902, 904-05 (1998). "The key question for the court when considering whether stagnation has occurred is whether the parent has made progress in ameliorating the conditions that led to state intervention." In re D.M., 2004 VT 41, ¶ 7, 176 Vt. 639, 852 A.2d 588 (mem.); see also In re D.C., 168 Vt. at 4, 712 A.2d at 904-05 ("[T]he question is whether the [parent's] improvement substantially conformed with the expectations at the time of the CHINS adjudication and with [DCF]'s case-plan." (quotation omitted)). We have consistently held that the "failure to meet expectations in the case plan can constitute changed circumstances for modification of a disposition order." In re A.G., 2004 VT 125, ¶ 23, 178 Vt. 7, 868 A.2d 692.

¶ 26. "[T]he decision of whether a substantial change of circumstances has occurred is a matter within the sound discretion of the family court." Id. ¶ 19 (quotation omitted). On review, we must uphold the court's findings unless clearly erroneous, and its conclusions where supported by the findings. Id. ¶ 17. This Court's role "is not to second-guess the family court or to reweigh the evidence, but rather to determine whether the court abused its discretion." In re S.B., 174 Vt. 427, 429, 800 A.2d 476, 479 (2002) (mem.).

¶ 27. There was no abuse of discretion here. The trial court's decision rests squarely on father's failure to make progress in ameliorating the conditions that led to state intervention and his failure to meet the expectations in the case plan. The record shows that parents have long struggled with substance use. A conditional care order (CCO) was issued in 2012 because of concerns about parents' substance use. The CCO required parents to be substance-free. Parents

13

were successful with the CCO and it was discharged in May 2013. The Department for Children and Families (DCF) maintained an open case, however, and it had renewed concerns in the fall of 2013 based, among other things, on father's admission to using alcohol and marijuana. The children were taken into emergency custody in February 2014, and in April 2014, father admitted the children were "in need of care and supervision due to . . . parents' substance use and how it interferes with parenting of the children."

¶ 28. The May 2014 case plan was developed with this background in mind. The plan had concurrent goals of reunification with parents or adoption, and it emphasized that due to parents' extensive substance use, it was important for parents to maintain sobriety and make sobriety a priority.[6] DCF recommended ongoing DCF custody of the children to give parents the time they needed to maintain sobriety and put other things in place, such as housing, mental health treatment, parent education, and financial stability. To this end, the case plan directed father, among other things, to sign all requested release of information forms in order to gather comprehensive information, as needed, continue all substance abuse treatment and follow all recommendations, and provide DCF with regular urine screens. Father was also cautioned to refrain from illegal activity. Father was supposed to comply with the case plan requirements by November 2014. DCF moved to terminate parents' rights in late October 2014, but the termination hearing was not held until August 2015, ten months later.

---

[6] The majority presumes that the case plan was concerned only with opiate use. See ante, ¶ 21. The trial court found otherwise, and its finding is supported by the record. There is nothing in the case plan that indicates father needed only to refrain from using opiates, or that limits father's substance use issues to opiates. To the contrary, the record indicates that DCF sought court involvement in the family's case based in part on concerns about father's alcohol and marijuana use. The case plan emphasizes sobriety, that is, a life free of any substance use. We must construe the record in support of the court's decision, not contrary to it as the majority does here. See, e.g., Cloutier v. Blowers, 172 Vt. 450, 461, 783 A.2d 961, 970 (2001) (on review, Supreme Court must "construe [findings] so as to support the judgment, if possible" (quotation omitted)).

14

¶ 29. Following a two-day evidentiary hearing, the court concluded that father had stagnated in his ability to resume parenting the children, one of whom had extensive needs due to spina bifida. In reaching its conclusion, the trial court recognized that father had made positive progress in addressing many of the case plan goals. Nonetheless, it found that the substance abuse that formed the basis of the CHINS finding remained inadequately addressed. The court specifically recognized that while some relapses could be expected, the evidence showed continued use over a long period of time.[7]

¶ 30. The evidence also indicated that father was not honest about his problems with substance abuse and, thus, not willing to truly address the issue. The court noted that when father was asked about positive drug tests, he responded a number of times, not by saying that he had used those drugs, but simply replying "[t]hat's what the test showed." Father also testified that he smoked marijuana only one or two times in the prior year when the evidence showed that there was THC in his system for six months between November 2014 and April 2015. Finally, with respect to substance use, the court did not credit father's testimony that he found the marijuana that he was smoking on the sidewalk. The court explained that the hearing was being held because the substance use issues, which led to the children coming into custody, needed to be addressed. And a big part of that was being able to discuss and work through the substance

---

[7] The majority has determined that father's substance use in 2014 is less probative than his use in 2015. Ante, ¶ 16 n.2. It thus discounts the fact that father tested positive twice for OXY in August and September 2014, positive for BZO in August 2014, positive for OPI-3000 in September 2014, and had three positive tests for THC in November and December 2014. Id. This Court should not be assessing the probative value of evidence on appeal. That role is reserved exclusively for the trial court. See In re A.F., 160 Vt. 175, 178, 624 A.2d 867, 869 (1993) ("When findings are attacked on appeal, our role is limited to determining whether they are supported by credible evidence. We leave it to the sound discretion of the family court to determine the credibility of the witnesses and to weigh the evidence." (citations omitted)). The court's finding that father engaged in continued substance use over a long period of time is supported by the record and appears to be unchallenged by father. Because the trial court was considering if father had complied with the expectations at the time of the CHINS decision and with the goals of the case plan, moreover, all of this behavior was relevant.

15

abuse issues, issues that by father's own admission, he needed to address. The court therefore had no confidence that father had adequately addressed the single issue that led to the children coming into custody. The court thus concluded that father had stagnated in his ability to parent despite the other very significant gains that he had made.

¶ 31. All of these findings are supported by the evidence, and they support the court's conclusion. Father acknowledged that the principal reason that the children were removed from his and the mother's custody was the parents' substance abuse. He testified to spending a week at the Brattleboro Retreat in February 2014, and to enrolling in a program that supplied him with Suboxone and that required him to be subjected to regular random drug testing. Father further testified that, because of the difficulty of getting to that program every day, beginning in July 2014 he entered into another program in which drug testing was done on a weekly, nonrandom basis.

¶ 32. The State then examined father about his weekly treatment notes, including drug tests results, between July 2014 and July 2015. Father provided these documents to the State in connection with the hearing and he stipulated to their admissibility. Father acknowledged testing positive for OxyContin in August and September 2014, benzodiazepine and opiates in September 2014, marijuana on more than a dozen occasions from November 2014 through April 2015, and amphetamines in May and June 2015. Despite these positive test results for various drugs, father testified that he had resolved his issues with drug use. He stated that he had found the marijuana on the sidewalk and had smoked only a few puffs "once or twice" at night to help him sleep, but progress notes from his weekly test results indicated that he was smoking "regularly" at times. The State also questioned father about progress notes from November 2014, which indicated that father had talked in detail about a friend who had recently overdosed in father's home. Although the notes indicate that father talked "about having needle in arm when saw friend turning blue,"

16

father denied that he was using intravenous drugs at the time or that his friend had taken drugs in his home.

¶ 33. The State also elicited testimony from the DCF caseworker who stated that, although father was seeking substance abuse treatment, he had not signed releases allowing her access to his substance abuse records. The caseworker opined that she continued to have "great concern" about father's substance use because he was adamantly denying substance use when the records showed otherwise. Her major concern was that his lying about being clean "puts him in a pre-contemplative state of substance recovery, which is not a place where we want parents to be when we're talking about reunification," and makes it difficult to "assess safety in [his] home around substance use when he's not being honest about what that use looks like."[8] There is ample evidence to support the court's conclusion that father failed to adequately address his substance use and failed to meet the goals of the case plan.

¶ 34. Father does not contest his drug use on appeal. He acknowledges that "some drug screen results revealed the presence of drug metabolites." He admitted to using certain drugs. He does not express any confusion on appeal about the treatment notes themselves, including the drug screen results, and he raised no objection to the meaning or the reliability of these documents below.[9] Rather than contesting the fact of his continued substance use, father's argument on appeal is that the trial court failed to specifically find how many drugs he took, how

---

[8] Again, the majority discounts this evidence, indicating that this testimony is "as close as the State got to explaining the significance of any continued drug use by father with respect to his ability to parent." Ante, ¶ 19 n.3. Assuming that such testimony was required, the majority does not indicate why the cited testimony does not suffice. The State was required to prove that father had not "substantially conformed with the expectations at the time of the CHINS adjudication and with [DCF]'s case-plan," In re D.C., 168 Vt. at 4, 712 A.2d at 904-05, and this evidence certainly speaks to that question. The case plan called for father to maintain sobriety, and the trial court reasonably could conclude that that essential goal had not been met.

[9] To the extent that father denied using the drugs reflected in the urine screens at the final hearing, that denial was a matter for the court to consider in evaluating the weight of the evidence. The trial court did not find father credible.

often, and the extent to which he was impaired by such use, and it failed to describe how his ongoing substance use impaired his ability to parent. The trial court was not required to make such findings. The court had already determined that father's substance abuse impaired his ability to parent at the CHINS stage. That is why the children were removed from parents' custody and placed in DCF custody and that is why a case plan was adopted that required father to make sobriety a priority. The evidence is undisputed that father and the mother had a longstanding history of substance abuse that impacted their ability to parent their children and resulted in the children being removed from their care. Father expressly acknowledged as much at the termination hearing. He cannot now argue, given this history, that his continued use of a variety of drugs over the course of a year after the children were placed in DCF is not a material change of circumstances based on stagnation.

¶ 35. Father also argues that he satisfied all of the goals set forth in the disposition case plan and remedied the circumstances that led to his children being taken into state custody, and thus, the court could not find stagnation. This is plainly incorrect. The case plan required the parents to continue all substance abuse treatment, follow all recommendations, provide regular urine screens, and sign all requested releases. Although father has continued substance abuse treatment and provided weekly urine screens, he has not signed all requested releases and, more importantly, has denied and minimized his continual use of drugs, despite the fact that substance abuse was the reason his children were removed from his and the mother's care. The disposition case plan goals also include that the parents demonstrate an ability to put the children's needs before their own, that they acknowledge how their choices put their children at risk, and that they not be involved in any illegal activity. Father's continued drug use, under the circumstances of this case, is not compatible with those goals.

¶ 36. The majority decision appears to rest on the fact that no witness testified whether the test results in the reports represented a failure to meet the goals of the case plan, and that the

18

State failed to provide evidence connecting father's use of drugs to his progress in meeting the case plan goals or to his parenting. Ante, ¶¶ 19, 21. The majority indicates that to prove stagnation, it is not enough to show that a parent continues to use drugs throughout the period that a child is in DCF custody and denies or minimizes such use.[10] Instead, the State must secure a pharmacologist, a substance abuse clinician, or a social worker "upon proper foundation and qualification in a given case" to testify that stagnation exists. Ante, ¶ 21. Neither our case law nor the statutes require such evidence. The question of whether father stagnated in his ability to parent by failing to comply with the goals of the case plan is a legal conclusion that rests within the trial court's sound discretion based on its assessment of the weight of the evidence. In re A.G., 2004 VT 125, ¶ 19.

¶ 37. The majority states that its holding is narrow. Ante, ¶ 23. It is hard to see how this is so. It has imposed a new requirement on the trial court. The court can no longer conclude that the evidence shows a failure to comply with the case plan unless someone testifies to that effect at trial. The court's holding will logically extend to the best-interest factors, particularly, the most important factor of whether a parent will be able to resume parenting within a reasonable period of time as these two legal conclusions are closely connected. See, e.g., In re A.W., 164 Vt. 412, 416, 670 A.2d 1265, 1267 (1995) (explaining that change in circumstances may be established by proof that parents' ability to care for child has "stagnated to the point that they are unable to resume parental duties within a reasonable period of time").

---

[10] The majority has reframed the question on appeal, and made an appellate finding that father's "use of an undetermined amount of marijuana throughout part of the period preceding the termination hearing" is insufficient to show stagnation. Ante, ¶ 23. It cites two of the statutory best-interest factors in support of this conclusion. The trial court did not base its decision on such a finding. It found that father engaged in continued substance use over a long period of time, and that he was not honest about his use and thus, not able to address and work through his substance use issues. These findings are supported by the record, and they reflect the trial court's assessment of father's credibility and the weight of the evidence. As to the children's best interests, which are not at issue absent a finding of stagnation, the trial court concluded that, the statutory best-interest factors supported termination of father's rights. The majority ignores the trial court's actual findings and conclusions in reaching its decision.

¶ 38. The only question before us in this appeal is "whether there was a basis in the record upon which the court could reach the conclusion it did" and not "whether there was a basis upon which the court might have reached a different conclusion." Griffis v. Cedar Hill Health Care Corp., 2008 VT 125, ¶ 15, 185 Vt. 74, 967 A.2d 1141. The trial court's decision here is supported by the record, and consistent with the law, and it should be affirmed. I therefore dissent.

 

 

Chief Justice