*Note: In the case title, an asterisk (\*) indicates an appellant and a double asterisk (\*\*) indicates a cross-appellant. Decisions of a three-justice panel are not to be considered as precedent before any tribunal.*

## ENTRY ORDER

SUPREME COURT DOCKET NO. 2018-015

MAY TERM, 2018

| | |
|---|---|
| In re R.B., Juvenile<br>(T.B., Mother\* & J.L., Father\*) | } APPEALED FROM:<br>}<br>} Superior Court, Chittenden Unit,<br>} Family Division<br>}<br>} DOCKET NO. 309-12-15 Cnjv<br><br>Trial Judge: Kirstin K. Schoonover |

In the above-entitled cause, the Clerk will enter:

Mother and father appeal an order of the superior court, family division, terminating their parental rights to their son, R.B. We affirm.

Neither mother nor father challenge any of the family court's findings or conclusions, which reveal the following. R.B. was born in December 2015. Within days of R.B.'s birth, the State petitioned the family court to adjudicate him a child in need of care or supervision (CHINS) because of mother's inability to care for her two older children, her substance abuse, and father's concerning criminal history. At a temporary care hearing on December 7, 2015, the court granted conditional custody to both parents, who were actively engaged in services at that time.

On February 10, 2016, the court accepted a CHINS merits stipulation from the parents. The following month, the court approved a disposition case plan that continued conditional custody with both parents. The disposition order required that: (1) mother refrain from using illegal drugs, provide weekly urine samples, and continue weekly therapy; (2) father abide by the law, complete a substance abuse evaluation, and refrain from drinking alcohol while caring for R.B.; and (3) father and mother sign releases and engage in in-home services and a family support program.

In April 2016, mother sought intensive care at the Maple Leaf Treatment Center after consuming a large amount of alcohol and experiencing a mental heath crisis. At the time of the May 2016 post-disposition review hearing, mother was still at the treatment center and father had been recently arrested for driving without a license and possession of cocaine. That same month, father began attending in-patient treatment at the Serenity House. The court ordered that custody of R.B. be transferred to DCF so that he could be temporarily placed with a family friend. R.B. remained in that placement until August 2016, when DCF began transitioning him to a longer term foster family because of concerns that neither parent was complying with the case plan.

Following the transfer to DCF custody, the parents' visits with R.B. were sporadic. In June 2016, father was arrested for disorderly conduct, and the next month he was arrested for violating his conditions of release based on an incident in the home involving alcohol and domestic abuse.

In late July 2016, father was incarcerated for approximately six weeks in connection with a domestic abuse charge. In September 2016, after father's release from jail, DCF scheduled a strict twice-a-week visitation schedule for parents.

In the fall of 2016, DCF filed a new case plan with concurrent goals of reunification and termination of parental rights. The case plan required that mother engage in consistent visitation with R.B., abstain from illegal substances, move into the Lund Family Center when a bed became available, and follow the Lund's rules and expectations once she was admitted. The case plan called for father to engage in consistent visitation, abstain from illegal substances, abide by conditions imposed by the Department of Corrections, obtain safe and stable housing, and participate in substance abuse counseling.

In November 2016, R.B. filed a petition for termination of parental rights, which the State joined in January 2017.

In March 2017, after mother was evicted from her apartment, she moved into the Lund Family Center. She was pregnant at the time. After the child was born, mother was discharged from the center and terminated from the program for creating an unsafe environment. Mother briefly moved in with her new child's care providers, but she was asked to leave that residence within the next two months. Mother's visits with R.B. continued to be sporadic, and in late September 2017 DCF asked the court to suspend the visits because of mother's lack of consistency. Mother's last visit with R.B. was in early September 2017, and father last visited with R.B. in late August 2017. Meanwhile, since September 2016, R.B. has been living with the same foster parents, who wish to adopt him.

Following the November 30, 2017 termination hearing, which neither parent attended, the family court terminated both mother's and father's parental rights. The court found by clear and convincing evidence that there had been a substantial change of circumstances insofar as neither parent was able to satisfy the expectations of the initial or modified case plans. See In re T.M., 2016 VT 23, ¶ 12, 201 Vt. 358 ("In considering a petition to modify a previous disposition order and terminate parental rights, the family court must first determine that there has been a material change in circumstances in the children's lives."). Mother was continuing to use illicit substances and was unable to complete the program at the Lund Family Center. She had not consistently visited R.B. and had not engaged in other services offered through the case plan. Father continued to use substances and engage in domestic violence. He had been in and out of jail for various criminal offenses and had not seen R.B. since August 2017.

For many of the same reasons, the court concluded by clear and convincing evidence that termination of both mother's and father's parental rights was in R.B.'s best interests. See 33 V.S.A. § 5114(a) (setting forth factors for court to consider in determining child's best interests). Meanwhile, R.B. had bonded to his foster family and had not seen his parents in months. In the court's view, neither parent played a constructive role in R.B.'s life. According to the court, given the parents' failure to follow through with the case plan and demonstrate an ability to care for R.B., who had been in foster care for much of his life, there was no likelihood that the parents would be able to resume their parenting duties within a reasonable period of time from the perspective of the child.

On appeal, mother argues that the family court erred by sustaining the State's objection to her attorney questioning the foster father as to whether he would consider a post-adoption contract agreement (PACA) pursuant to 33 V.S.A. § 5124. In relevant part, parents and intended adoptive parents may enter into a PACA regarding communication or contact between the parents and child

2

after finalization of an adoption if the child is in the custody of DCF, a termination order has not yet issued, and "either or both parents agree to a voluntary termination of parental rights, including an agreement in a case which began as an involuntary termination of parental rights." 33 V.S.A. § 5124(a). In this case, the DCF caseworker testified that a week or two before the termination hearing, mother asked him if the foster parents would be open to considering a PACA. Later in the hearing, mother's attorney asked R.B.'s foster father whether it was true that he and his wife were not open to doing a PACA. The foster father responded that they had never discussed it. When mother's attorney sought clarification of the foster father's response, the state's attorney objected. The court sustained the objection, explaining that the foster parents had no obligation to enter into such an agreement and that the foster father's response to this questioning would not affect its analysis.

Mother now argues that, absent a PACA, in a termination proceeding the family court must often decide whether to terminate parental rights, which would legally preclude future parent-child contact, or to deny the termination petition because of a loving parental bond overriding other best-interest factors. By holding that the foster parents' views regarding a PACA were irrelevant, the family court overlooked the overarching purpose of the juvenile proceedings act to foster the children's best interests while preserving family relationships to the extent possible. See 33 V.S.A. § 5101(a) (stating purposes of juvenile proceedings act). Father joins this argument.

We reject parents' argument. They have not challenged any of the family court's findings or conclusions, including the court's findings regarding R.B.'s extremely negative reactions following parental visits and its conclusion that neither parent played a constructive role in R.B.'s life. We need not decide whether the willingness of pre-adoptive foster parents to agree to a PACA can ever be a relevant consideration. Given the trial court's findings that parents stopped visiting with R.B. months before the final hearing, and that the child became completely dysregulated when they did visit, and given the court's conclusion that parents do not play a constructive role in R.B.'s life, the foster parents' willingness to enter into a PACA is of no moment in this case.

For his part, father also argues that the family court erred by failing to address the foster parents' refusal to abide by their obligations to attend and participate in shared parenting meetings despite parents' repeated requests that they take place. According to father, because of the foster parents' refusal to participate in shared parenting meetings, the parents were prevented from learning of and sharing in R.B.'s current needs and responses, which negatively impacted the reunification planning process.

Shared parenting meetings are a component of DCF's family time program, which is concerned with parent-child visitation. DCF's family services manual indicates that the purpose of shared parenting meetings is to bring together the social worker, the parents, the foster parents, and if appropriate the child, to review and develop the plan for family time and to deepen the relationship between those persons who care for the child so that they can better serve the child's needs. The DCF caseworker testified at the termination hearing that mother had requested shared parenting meetings on several occasions but that they never occurred, apparently due to resistance by the foster parents.

Again, we find this argument unpersuasive. Nothing in the record in this case suggests that either father's or mother's lack of progress towards reunification was caused to any degree by the absence of shared parenting meetings with the foster parents. Indeed, the evidence and the unchallenged family court findings demonstrate that both parents were inconsistent at best in visiting R.B. from the time R.B. was removed from their care in May 2016. Father points only to mother's request for shared parenting meetings in her motion to enforce filed in February 2017,

three months after the termination petition was filed and nine months after R.B. was transferred to DCF custody.  The trial court did not abuse its discretion in weighing the evidence in this case, and failing to assign significance to the absence of shared parenting meetings.

Affirmed.

BY THE COURT:

_____
Paul L. Reiber, Chief Justice

_____
Beth Robinson, Associate Justice

_____
Harold E. Eaton, Jr., Associate Justice

4