VERMONT SUPREME COURT
109 State Street
Montpelier VT 05609-0801
802-828-4774
www.vermontjudiciary.org

Case No.        22-AP-346



*Note: In the case title, an asterisk (\*) indicates an appellant and a double asterisk (\*\*) indicates a cross-appellant.  Decisions of a three-justice panel are not to be considered as precedent before any tribunal.*

## ENTRY ORDER

APRIL TERM,   2023

| | |
|---|---|
| In re S.G., C.G, B.B, Juveniles<br>(K.B., Mother\*) | }<br>}<br>}<br>}<br>}<br>} | APPEALED FROM:<br><br>Superior Court, Windham Unit,<br>Family Division<br>CASE NOS. 6-1-20 Wmjv; 7-1-20 Wmjv &<br>8-1-20 Wmjv<br>Trial Judge: Elizabeth D. Mann |

In the above-entitled cause, the Clerk will enter:

Mother appeals the termination of her parental rights to sons S.G., C.G., and B.B.  We affirm.

S.G. was born in December 2007, C.G. was born in September 2009, and B.B., their half-brother, was born in April 2012.[1]  In January 2020, when the boys were twelve, ten, and seven years old, respectively, the State filed a petition alleging that they were children in need of care or supervision (CHINS) due to reports of mother's substance abuse, depression, and self-harm, as well as severely unclean conditions in the family home, and violent and threatening behaviors by the children.  The court transferred custody to the Department for Children and Families (DCF) in emergency and temporary care orders.

In October 2020, mother stipulated to the merits of the petition, which included a psychological assessment of B.B., the youngest child.  The assessment indicated that B.B.'s aggression towards teachers and peers and threats of self-harm were exacerbated by his exposure to a chaotic home environment that included substance abuse and violence.

In December 2020, the court issued a disposition order with a goal of reunification with mother.  The disposition case plan called for mother to provide stable and emotionally safe

---

[1]  A New Hampshire court terminated the parental rights of S.G. and C.G.'s father in 2013.  B.B.'s father passed away in 2021.

parenting for the children, understand their developmental needs, maintain a safe and stable home for reunification, learn to identify safe and healthy relationships, and maintain sobriety. It also recommended that mother engage in mental-health and substance-abuse treatment.

In March 2021, the parties stipulated that mother would resume custody of the children under a conditional custody order (CCO). A case update submitted by DCF in May 2021 indicated that both S.G. and C.G.'s behavior and school attendance were improving. However, B.B. was frequently tardy to school and continued to have significant episodes of dysregulation, and mother was inconsistent in attending her individual therapy sessions.

In July 2021, mother was charged with three counts of violating conditions of release by contacting her ex-boyfriend, whom she had allegedly assaulted in 2020. In November 2021, the State moved to vacate the CCO and return custody to DCF due to mother's ongoing substance abuse, mental-health concerns, and difficulties in meeting the children's educational and medical needs. The court granted the motion.

In April 2022, DCF petitioned to terminate mother's parental rights. The court held a three-day hearing in September and October 2022 and issued a final order in November 2022. The court found that after the children reentered DCF custody in November 2021, S.G. and C.G. were placed with one foster family, while B.B. was placed with a different family. C.G. continued to engage in negative behaviors—including running away, threatening suicide with sharp objects, and extreme dysregulation—that eventually led to his placement in a residential facility. Since reentering DCF custody, S.G. and B.B. had thrived in their stable home environments and C.G. was benefiting from the treatment and services he received at his residential placement.

The court found that mother loved her children but had been unable to provide a stable and safe home environment for them. Mother had been in a series of abusive relationships with men who exposed the children to domestic violence and substance abuse. When she was charged in July 2021 with violating her conditions of release by driving to her ex-boyfriend's house and yelling at him, she allegedly had one of the children in the car with her. The court found that mother was currently in a romantic relationship with a man who had a pending charge for aggravated domestic assault, which posed a risk to the children. The court found that during the CCO period, mother had picked up B.B. in the company of an acquaintance who had an active arrest warrant, without regard for the impact that police involvement and the arrest of that acquaintance could have on B.B. The court found that mother had consistently demonstrated a lack of awareness about the unsafe individuals with whom she associated and exposed her children to these individuals.

Mother acknowledged that she had been diagnosed with depression, borderline personality disorder, post-traumatic stress disorder, mood instability, and substance-abuse disorder, and had a history of self-harm. However, her involvement in therapy during the CHINS proceeding had been minimal and she had not successfully addressed her mental-health concerns. Mother resisted DCF's recommendation that she enroll in the partial hospitalization program offered at Brattleboro Retreat for substance abuse. Once she agreed to do so, she was discharged early after missing three appointments in a row. She had drug overdoses in February 2019 and January 2022, and had to be revived with Narcan on both occasions. She had provided

only one clean urinalysis test during the course of the CHINS proceeding and had failed to attend the three most recent tests. She had also been experiencing unexplained seizures.

The court found that during the period when mother had custody under the CCO, she frequently had to call on her brother or her neighbors to take one of the boys so that they would be separated from each other. Her brother also went to her house two or three times a week to wake her up to ensure the children attended school. Despite this, the boys had numerous unexcused absences from school. In October 2021, S.G. was locked out of the house overnight and was unable to reach mother until the following morning. Mother's home continued to be cluttered and unclean, and she failed to secure B.B.'s medications as recommended by DCF. Mother was offered extensive in-home supports during this period but was unable to make improvements.

After the CCO was vacated, mother stated in the children's presence that she did not want to continue visits with them. She missed a significant number of visits with the children. She admitted that most of the missed visits were due to her forgetting to confirm the visit, oversleeping, or forgetting the visit altogether. In September 2022, she appeared four hours late for C.G.'s birthday party at his residential placement in New Hampshire, upsetting B.B., who had to be comforted by his brothers. When mother did attend visits, she would sometimes fall asleep and rock back and forth.

The court found that there was a change in circumstances because mother failed to take the steps recommended in the case plan to address the concerns that led to the children entering custody. It then assessed the factors set forth in 33 V.S.A. § 5114 and found that each factor weighed in favor of termination. The court found that due to mother's lack of progress and failure to engage in services offered to her, she would not be able to resume parenting the children within a reasonable time. She cared about them but had not addressed her own significant needs or engaged with their medical and educational providers to understand and meet the children's needs. Although she had a home large enough for the family, the court found no evidence that she had addressed the issues that made the home unsafe. The court found that the children were thriving in each of their placements and their extreme emotional dysregulation and aggressive behaviors had subsided. It therefore granted the petitions to terminate mother's rights.

On appeal, mother challenges the court's finding that she had stagnated in her progress toward reunification. Mother argues that throughout the proceeding, she maintained a three-bedroom apartment for her and the children.[2] She points to evidence that she made some progress in therapy, that she missed some visits for legitimate medical reasons, and that she had a strong bond with the children.

---

[2] Mother also asserts that she earned income sufficient to support the family throughout the case. The family division did not make any findings about mother's financial situation or rely upon it as factor in its decision. To the extent mother is claiming this was error, she points to nothing in the record to support her assertion other than her own proposed findings, and, as we conclude, there was ample other evidence to demonstrate stagnation.

When the State seeks to terminate parental rights after initial disposition, the court must first determine whether there has been a change in circumstances justifying modification of the original disposition order.  In re B.W., 162 Vt. 287, 291 (1994).  If this threshold condition is met, then the court must consider whether termination is in the child's best interests, in accordance with the factors set forth in 33 V.S.A. § 5114(a).  Id.  A change in circumstances "is most often found when the parent's ability to care properly for the child has either stagnated or deteriorated over the passage of time."  Id. (quotation omitted).  "The key question for the court when considering whether stagnation has occurred is whether the parent has made progress in ameliorating the conditions that led to state intervention."  In re T.M., 2016 VT 23, ¶ 12, 201 Vt. 358 (quotation omitted).  "We will affirm the court's decision if the findings are based on the evidence and support the court's conclusions."  In re D.M., 2004 VT 41, ¶ 5, 176 Vt. 639 (mem.).

The record supports the family division's finding of stagnation.  The court found that mother's contact with the children had been inconsistent and she had not been able to increase her contact since the CCO was vacated in November 2021.  Mother does not challenge this finding but asserts that her frequent missed visits were due in part to physical illness.  However, mother testified at the hearing below that, even before she had appendicitis in March 2022, she had a hard time remembering to confirm visits, and would oversleep or just "get side tracked and forget."  When she did attend visits, she would sometimes fall asleep or rock back and forth.  In addition to her inconsistent visitation, mother conceded that she had not engaged with the children's schools or their medical, dental, and mental-health providers in the past year.

The evidence also showed that mother did not consistently engage in individual or group mental-health therapy.  Although mother's therapist recommended biweekly individual therapy sessions, mother never saw the therapist on a biweekly basis.  Mother was discharged from the partial hospitalization program due to lack of attendance.  Mother's therapist testified that in 2022, she only had consistent meetings with mother in January and June.  Mother testified that she did not feel group therapy was beneficial and acknowledged missing sessions.

The court acknowledged that mother had maintained an apartment large enough for the family during the proceeding.  However, it found that she had not been able to maintain a safe and stable environment in that home.  The court's other findings, which mother does not challenge, support this conclusion: mother had not maintained sobriety, completed recommended drug treatment options, or stopped associating with known drug users as required by the case plan.  And while the court found that mother loved the children, it also determined that she did not presently play a constructive role in their lives, as evidenced by her inability to prioritize their needs.  The record supports these findings.

Mother essentially argues that the court should have given more weight to the evidence in her favor.  However, "[o]ur role is not to second-guess the family court or to reweigh the evidence, but rather to determine whether the court abused its discretion."  In re S.B., 174 Vt. 427, 429 (2002).  Furthermore, "the mere fact that a parent has shown some progress in some aspects of his or her life does not preclude a finding of" stagnation.  In re A.F., 160 Vt. 175, 181 (1993).  The evidence supported the court's determination that mother had made insufficient progress in addressing the conditions that led the children to enter state custody, and therefore

that there had been a change in circumstances sufficient to justify modification of the initial disposition order.

       Affirmed.

BY THE COURT:

_____
Paul L. Reiber, Chief Justice

_____
Harold E. Eaton, Jr., Associate Justice

_____
William D. Cohen, Associate Justice