VERMONT SUPREME COURT
109 State Street
Montpelier VT 05609-0801
802-828-4774
www.vermontjudiciary.org

Case No.    23-AP-008



*Note: In the case title, an asterisk (\*) indicates an appellant and a double asterisk (\*\*) indicates a cross-appellant. Decisions of a three-justice panel are not to be considered as precedent before any tribunal.*

## ENTRY ORDER

JUNE TERM,   2023

In re T.A., Juvenile                    }    APPEALED FROM:
(N.A., Father\*)                        }
                                        }    Superior Court, Caledonia Unit,
                                        }    Family Division
                                        }    CASE NO. 57-11-19 Cajv
                                             Trial Judge: Thomas J. Devine

In the above-entitled cause, the Clerk will enter:

Father appeals the termination of his parental rights to twelve-year-old daughter T.A.  We affirm.

In November 2019, the State filed a petition alleging that T.A. was a child in need of care or supervision (CHINS).  The court transferred custody to the Department for Children and Families (DCF).  Father stipulated to the merits of the CHINS petition in December 2019.  The court issued a disposition order setting a permanency goal of reunification with father.  In August 2021, DCF filed a petition to terminate father's parental rights.  The court held a hearing over three days in April, June, and September 2022, after which it issued a written order containing the following findings.

Father and mother had two children together.  C.A. was born in 2007 and T.A., the child who is the subject of this appeal, was born in 2010.  Around the time C.A. was born, father lost his construction job and became a stay-at-home parent to C.A.  After T.A.'s birth, father and mother shared parenting responsibilities for a time.

In 2012, father was diagnosed with bipolar disorder.  He began counseling and was prescribed medication.  Later that year, father and mother ended their relationship and father moved out.  Father was unemployed and moved into a homeless shelter.  Over the next five years, father struggled to maintain housing.  Mother accused father of abusing the children. Father disappeared from the girls' lives during this time.

Both children were believed to have been sexually abused by their maternal step-grandfather when they were in mother's care.  In April 2017, the children were the subject of a

CHINS petition. A DCF investigator met with father. He was not substantiated for any physical or sexual abuse of the children.

In August 2017, mother died of an overdose. The children were placed in father's care subject to a conditional custody order. By then, father had moved in with a new romantic partner in Waterford, Vermont. The CHINS proceeding was closed a few months later.

T.A. was seven when she was placed with father. She and her sister were grief-stricken over the loss of their mother. T.A. displayed dysregulated behaviors at school and at home. Father enrolled her in weekly counseling and attended every other session. T.A. was determined to be eligible for an individualized education plan. She transferred to an alternative school for children with behavioral needs and was prescribed medication for ADHD. Father ensured that she took her medication.

One evening in May 2018, father was caring for the children by himself. The children refused to go to bed after watching a movie and began acting up. Father took a belt and physically disciplined C.A. The children reported the discipline at school the next day. After this incident, father and his partner separated and father moved out, leaving the girls in the partner's care. Father's former partner filed a petition to become their guardian. Father did not contest the petition, and it was approved.

During this period, father moved to Barre, where he again struggled to find stable housing. He visited the children infrequently due to the long drive and tension between him and the guardian. After he left, he did not provide sustained care for the children or have any overnight contact with them.

The guardian's health began to decline, and in October 2019, she filed a petition to terminate the guardianship. She contacted DCF for help finding a new placement for the children, leading the State to initiate this juvenile proceeding.

After entering DCF custody in November 2019, the children changed placements several times because of their challenging behaviors. Eventually, in October 2020, T.A. was placed separately from her sister with a foster family in Barre. She has been in their care since that time.

In January 2020, the court adopted a case plan with a permanency goal of reunification with father within six months. The plan called for father to engage in Family Time Coaching; learn to use developmentally appropriate, non-physical disciplinary strategies; allow DCF to assess his housing and ensure T.A. and her sister had their own bedrooms; attend all medical and dental appointments and team meetings; and develop a plan to care for the children full-time while providing for them financially.

Father attended Family Time Coaching beginning in December 2019. He developed a good working relationship with the coach, accepted feedback, and learned to improve communication with the children. However, he focused most of his attention on T.A.'s sister, who was more outgoing and vocal about her needs. T.A. would become frustrated and withdrawn when this occurred.

In March 2020, in-person visitation stopped for several months due to the pandemic. Instead, father and the girls had virtual contact, with support from the Family Time coach. T.A. struggled to engage in virtual contact. Beginning in July 2020, father had some in-person visits

with C.A. and T.A. that seemed to go well; however, father continued to pay more attention to C.A.

During the summer of 2020, father was living in the home of his then-girlfriend's son in Barre. The son refused to provide information to DCF about himself or other occupants, preventing DCF from conducting background checks to approve the home for reunification. Father had found employment working for a construction crew. He worked long hours at times. He was no longer in counseling but did participate in most team meetings for T.A.

In the fall of 2020, father broke up with his girlfriend and lost his housing. Family Time Coaching was moved to a church in Barre. As 2021 began, visits became increasingly stressful for T.A. Father continued to focus more of his attention on C.A.

In April 2021, T.A. had a panic attack at school and declared she was not going to attend any more visits. She refused to attend visits even if C.A. was not present. She eventually agreed to telephone contact, but father struggled to call at the appointed time, which upset T.A. greatly. After this went on for some time, T.A. stopped answering father's calls. She also ceased contact with C.A. Father and the DCF worker agreed that father would not attempt telephone contact or seek to attend medical or other appointments to avoid upsetting T.A. He kept in contact with T.A.'s providers and received updates from DCF.

T.A. later made father a video stating that she was happy with her foster parents and did not want to reunify. Father sent T.A. a letter thanking her for telling him how she felt. T.A. then sent him another video. Father responded with a video stating he loved and missed her. The DCF worker reviewed the video and found it to be sensitive and appropriate.

In May 2022, T.A. expressed interest in contacting father. A visit was scheduled to be held at T.A.'s therapist's office. As the appointed day approached, T.A. became visibly stressed and anxious and expressed fear that father would take her away. She eventually cancelled the visit.

T.A.'s doctor testified that T.A. had been diagnosed with PTSD and ADHD and had developmental trauma. She responded to stress with extreme dysregulation and had sensory processing issues. T.A.'s doctor opined that T.A. associated father with a time in her life that she experienced trauma. She loved her father but did not want to live with him. T.A.'s doctor offered to meet with father to discuss these issues, but father did not attend the appointment. T.A.'s doctor opined that T.A. needed a caregiver who was attuned to her physiological reactions and could respond in a trauma-informed way. The court found the doctor to be credible in her testimony that father did not have a good understanding of trauma and its effect on T.A.

The court found that father had worked hard to engage in the case plan. He consistently attended Family Time Coaching and visits and had learned to use non-physical disciplinary techniques. He had taken the Nurturing Parents class twice and also attended a class on trauma. However, father struggled to manage the needs of both children together. He had not gained insight into T.A.'s emotional needs and how to address them. For example, he attributed T.A.'s April 2021 panic attack and refusal to attend visits to her feeling shame about taking another child's Easter candy. Father also had not found stable housing suitable for reunification. At the time of the termination hearing, he was sleeping in a friend's living room. He had not put together a plan for caring for T.A. when he was at work. He had struggled to even keep telephone appointments with T.A. due to his work commitments. Based on these factors, the court concluded that father had stagnated in his progress toward reunification.

The court then assessed the statutory best-interests factors. It found that father and T.A. loved each other but that his long absences from her life had negatively affected their relationship. She did not look to him for comfort. T.A. had formed a close and loving relationship with her foster parents, who were capable of meeting her complex needs. She was well adjusted to her foster home, school, and local providers. The court found that father was unlikely to be able to resume parental duties within a reasonable time. Before reunification could occur, T.A. would need to make significant therapeutic progress, and father would have to learn how to meet her emotional needs. T.A. had expressed a strong desire not to reunify. Father's living situation was unstable, and he had no plan for supervising T.A. outside of school hours. The court found that father loved T.A. and had tried to improve as a parent, but that he was not prepared to parent a child with trauma. It therefore concluded that termination was in T.A.'s best interests.

On appeal, father challenges the court's finding of stagnation. When considering a petition to terminate parental rights after initial disposition, the family division must first determine whether there has been a change in circumstances sufficient to justify modification of the original disposition order. In re B.W., 162 Vt. 287, 291 (1994). If it finds a change in circumstances, the court must consider whether termination is in the child's best interests using the factors set forth in 33 V.S.A. § 5114(a). Id. A change in circumstances "is most often found when the parent's ability to care properly for the child has either stagnated or deteriorated over the passage of time." Id. (quotation omitted). "The key question for the court when considering whether stagnation has occurred is whether the parent has made progress in ameliorating the conditions that led to state intervention." In re T.M., 2016 VT 23, ¶ 12, 201 Vt. 358 (quotation omitted). "We will affirm the court's decision if the findings are based on the evidence and support the court's conclusions." In re D.M., 2004 VT 41, ¶ 5, 176 Vt. 639 (mem.).

Father argues that the family division failed to account for the impact of the COVID-19 pandemic on his relationship with T.A. Father contends that the pandemic was a factor beyond his control that severely hindered his ability to bond with T.A. because it interrupted in-person Family Time Coaching and they did not communicate effectively during virtual visits. He faults DCF for not continuing in-person contact during the early months of the pandemic and for asking him to stop calling T.A. and attending her medical appointments.

Father is correct that stagnation caused by factors beyond a parent's control cannot support termination of parental rights. In re S.R., 157 Vt. 417, 421-22 (1991). However, the record does not support father's claims that the deterioration of his relationship with T.A. was caused entirely by the pandemic and DCF. Father left T.A. and her sister with their guardian and, at least partly by his own choice, had very little contact with T.A. for over a year. After the CHINS petition was filed and Family Time Coaching began, father focused most of his attention on C.A., which upset T.A. and made visits difficult. This problem was attributable to father, not the pandemic, and it arose again after in-person visits resumed in July 2020. Eventually, T.A. refused to attend visits at all. The trial court found, based on the testimony of T.A.'s doctor, that T.A.'s reluctance to see father stemmed from her association of father with past trauma—a factor that also predated the pandemic. Father had not gained insight into T.A.'s trauma and admitted that he did not understand her reactions or how to meet her emotional needs. The deterioration in their relationship was compounded by father's inability to call T.A. when he was supposed to. Although father blamed this on his work schedule, he did not explain why he could not have scheduled calls for a time when he was not working and would have reliable telephone service. It is true that DCF eventually asked father not to call T.A. or attend her medical appointments,

but this occurred after their relationship had deteriorated to a point that contact would be unduly upsetting to T.A., and it was not a cause of that deterioration.

Father also claims that his failure to find stable housing was due to a chronic shortage of affordable housing in Vermont, another factor beyond his control. The record undercuts father's claim that his lack of stable housing was due entirely to the current affordable housing crisis. Father had long depended on romantic partners for housing and had not maintained his own housing for any significant length of time. But even accepting that father's inability to find stable housing since the pandemic was beyond his control, this would not justify reversing the decision below because the trial court's finding of stagnation was amply supported by its other findings. Most importantly, father had not achieved an understanding of T.A.'s trauma or learned to meet T.A.'s complex emotional needs. He also was unable to manage T.A. and her sister together; had not consistently attended telephone visits; and did not have a plan for caring for T.A. on a full-time basis. Further, he had not seen T.A. for over a year and had not spent more than a few hours with her at a time since 2018. These findings are supported by the record and in turn support the court's finding that there had been a change in circumstances based on parental stagnation. See In re D.M., 162 Vt. 33, 38 (1994) (recognizing that stagnation may be found "in cases in which parenting skills improve, yet the improvement is so insignificant that it is unlikely the parent will be able to resume parental duties in a reasonable time").

Father does not challenge any of the court's other findings, which are supported by the record and in turn support its conclusion that termination was in T.A.'s best interests. We therefore affirm the decision below.

Affirmed.

BY THE COURT:

Harold E. Eaton, Jr., Associate Justice

William D. Cohen, Associate Justice

Nancy J. Waples, Associate Justice

5